STATE of Minnesota, Respondent,

v.

Larry Eugene TUNGLAND, Appellant.

No. 48614.

Supreme Court of Minnesota.

March 23, 1979.

Rehearing Denied July 19, 1979.

C. Paul Jones, Public Defender, and Mollie G. Raskind, Asst. Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., Richard G. Evans, Sp. Asst. Atty. Gen., St. Paul, Elton A. Kuderer, County Atty., Fairmont, for respondent.

KELLY, Justice.

Defendant was charged with three offenses: (1) violation of the open bottle law, Minn.St. 169.122, subd. 3, (2) illegal possession of marijuana, Minn.St. 152.09, subd. 1(1) and 152.15, subd. 1(2), and (3) illegal possession of LSD, Minn.St. 152.09, subd. 1(2) and 152.15, subd. 2(2). A district court jury found defendant guilty of the first two counts and not guilty of the third, and the presiding judge stayed imposition of sentence and placed defendant on probation for 3 years. The main issues raised by defendant on appeal relate to the legality of the police conduct leading to defendant's arrest and the seizure of the items he was charged with possessing. We affirm.

On Sunday, March 6, 1977, the owner of Jaqua's Standard in Fairmont found on opening the station at 9 a. m. that there were two cars parked on his property without his permission. Because he used these spaces to park cars which were being serviced, Jaqua called the police and asked them to come and ticket the cars, hoping that the tickets would discourage the owners of the cars from parking there again.

Officer Gordon Klopp of the Fairmont Police Department answered Jaqua's call. Klopp ran a computer check on the licenses of both cars. We are primarily concerned with the larger of the two cars, which was defendant's car. Klopp's check of this car's

plates, which were Iowa plates, revealed the name of the registered owner but further checking revealed that he no longer owned the car.

After running the license checks, Klopp decided to ticket both cars for illegally parking on private property. Klopp could not cite any ordinance justifying this but testified at the omnibus hearing that it was standard practice for the police to ticket, but not tow, cars parked on private property without the permission of the owner. The prosecutor admitted at the omnibus hearing that there was no ordinance permitting this ticketing.

In any event, Klopp wrote out tickets for both cars and went to place the tickets on the door handles. While doing this he looked through the windows into each car. Klopp did not see anything in the smaller of the two cars and did not try the doors to see if the car was locked. However, Klopp saw a whiskey bottle which was half-full lying in open view in the center of the front seat of the larger car. He also saw some unopened beer cans in the front seat. Klopp testified that he was concerned that if the car was open juveniles might get in and use the liquor, so he checked to see if the car was locked and found that it was not and that the key was in the ignition. Without entering the car Klopp then looked into the back seat and saw in open view a large grocery bag. The bag was open enough so that Klopp could see that it contained plastic packages but he could not see what the plastic packages contained.

At this point Klopp opened the door, reached inside the open bag and discovered that the plastic bags contained what appeared to be marijuana. Klopp then put the bag back, shut the door, and called a superior, Sergeant Richard Bolster, to the scene.

Bolster in turn called an assistant county attorney, and a decision was made to leave the liquor and the suspected marijuana in the car and to advise Jaqua to move the car to the street, lock it, and leave a note for the owner to see him about the keys. A related decision was also made to put the

car under surveillance and wait for the unknown owner to appear and claim it.

At about 1:45 p. m. defendant and Danny Frerichs appeared at the station and claimed the car, which by then had been parked on the street by one of the station employees. The two then got into the car and drove off with defendant doing the driving.

Bolster, who stopped them 2 blocks away, testified that as defendant was getting out Frerichs reached into the back seat and did something. Upon looking into the car Bolster saw that the liquor was no longer in open view on the front seat and he discovered that the grocery bag with the marijuana had been covered with some coats.

After arresting the two, Bolster seized these items. In the grocery bag he found 13 plastic bags containing the suspected marijuana. (An expert from the state crime lab later testified that the substance indeed was marijuana and that the total weight of the 13 bags was 22.1 ounces.)

Defendant, when questioned at the scene and later at the station, admitted the car was his but denied knowing who owned the marijuana. He explained his having parked the car in Jaqua's lot by saying he had been to a nearby bar the night before but had left the bar and the town with friends in a different car and had not been able to reclaim the car until then.

The LSD, by the way, was found during an inventory search of defendant's car after it was towed and impounded. Specifically, the police found a small amount of marijuana and 21 LSD tablets in a container under the front seat on the passenger side.

The trial court denied the motion to suppress, and the jury, as we said, found defendant guilty of the open bottle and the marijuana charges but not the LSD charge.

1. Defendant's first contention is that the trial court erred in denying his motion to suppress the seized items. There are two basic parts to this argument. First, defendant contends that Officer Klopp violated the Fourth Amendment in intruding into the parked automobile to examine the con-

tents of the grocery bag. Second, defendant challenges the stakeout and related conduct, including the second search, on the ground that (i) they were a product of the earlier illegal search, and (ii) they constituted entrapment.

■ The key issue is whether the first search—i.e., the one by Officer Klopp—was illegal. The trial court did not decide the issue, saying that "Although the first search which disclosed the presence of the marijuana may have been illegal, the second was not."

We start our analysis with the proposition that it was not improper for Klopp to respond to the complaint by Jaqua and that it was not improper for him to look into the car while standing outside. He could have looked into the car if it had been parked on the street and since the lot was Jaqua's he clearly also had authority to look at it while it was parked in the lot.

If while standing in that position and looking in he had seen marijuana in open view, then he would have had probable cause to believe the car contained evidence of a crime and under the so-called automobile exception (or *Carroll* doctrine) he could have entered the car without a warrant because of the combination of the probable cause with the exigency created by the movable nature of the car. While the prosecution in its brief states that before he ever entered the car Klopp "based upon his 19 years experience as a policeman * * * suspected that the packages contained an illegal controlled substance," the record simply does not support this statement. What Klopp testified was that *after* reaching into the grocery bag and picking up one of the plastic bags and examining it he first reached the conclusion the plastic bags contained marijuana. In other words, one cannot justify the intrusion into the car and the search of the grocery bag on the theory that before he entered the car Klopp had probable cause to believe the bag contained marijuana because it is clear that Klopp did not have this probable cause.

Another justification offered by the state for Klopp's entering the car was that his admittedly legal observation of the open bottle in open view gave him investigative grounds for entering into the unlocked car and searching the grocery bag. The trouble with this argument is that the car was parked on a private lot and no one was driving it. Therefore, it was not a violation of the open bottle law for defendant to have left the open bottle in the passenger compartment of the car, since the open bottle law specifically prohibits keeping open bottles in motor vehicles only "when such vehicle is upon the public highway." Minn.St. 169.122, subd. 3. Since technically Klopp did not observe anything illegal in the vehicle, he had no valid criminal investigative reason to enter the vehicle and conduct the search.

Having said all this and recognizing that this a close case, we nonetheless conclude that the court did not err in denying the motion to suppress. The key factor leading us to this conclusion is our belief that defendant by his conduct, objectively viewed, demonstrated that he did not have any legitimate expectation of privacy in the passenger area of his car during the time that it was parked on the Jaqua lot.

Recently, in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the United States Supreme Court held that certain passengers in an automobile, who did not assert a property or possessory interest in the searched vehicle or in the property seized and who failed to show that they had any legitimate expectation of privacy in the areas from which the items were seized, were not entitled to challenge the search of these areas. In his helpful concurring opinion Justice Powell stated in part as follows:

"* * * Only legitimate expectations of privacy are protected by the Constitution. In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Court rejected the notion that the Fourth Amendment protects places or property, ruling that the scope of the Amendment must be determined by the scope of privacy that a free people legitimately may expect. See id., at 353, 88

S.Ct., at 512. As Mr. Justice Harlan pointed out in his concurrence, however, it is not enough that an individual desired or anticipated that he would be free from governmental intrusion. Rather, for an expectation to deserve the protection of the Fourth Amendment, it must 'be one that society is prepared to recognize as "reasonable." ' See id., at 361, 88 S.Ct., at 516.

"The ultimate question, therefore, is whether one's claim to privacy from government intrusion is reasonable in light of all the surrounding circumstances. * * *

"In considering the reasonableness of asserted privacy expectations, the Court has recognized that no single factor invariably will be determinative. Thus, the Court has examined whether a person invoking the protection of the Fourth Amendment took normal precautions to maintain his privacy—that is, precautions customarily taken by those seeking privacy. See, e.g., *United States v. Chadwick*, 433 U.S. 1, 11, 97 S.Ct. 2476, 2483, 53 L.Ed.2d 538 (1977) ('By placing personal effects inside a double-locked footlocker, respondents manifested an expectation that the contents would remain free from public examination'); *Katz v. United States*, 389 U.S. 347, 352, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967) ('One who occupies [a telephone booth], shuts the door behind him, and pays the toll that permits him to place a call is surely entitled to assume that the words he utters into the mouthpiece will not be broadcast to the world'). Similarly, the Court has looked to the way a person has used a location, to determine whether the Fourth Amendment should protect his expectations of privacy. In *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), for example, the Court found that the defendant had a Fourth Amendment privacy interest in an apartment in which he had slept and in which he kept his clothing. The Court on occasion also has looked to history to discern whether certain types of government intrusion were perceived to be objectionable by the Framers of the Fourth Amendment. See *United States v. Chadwick*, 433 U.S., at 7–9, 97 S.Ct., at 2481–2482. And, as the Court states today, property rights reflect society's explicit recognition of a person's authority to act as he wishes in certain areas, and therefore should be considered in determining whether an individual's expectations of privacy are reasonable. See *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)." 439 U.S. 151, 99 S.Ct. 434, 58 L.Ed.2d 387.

Without in any way intending to suggest a general rule that the interior of an automobile has no Fourth Amendment protection, we merely hold that under the circumstances of this case defendant's conduct mandates the conclusion that any expectation of privacy he had in the passenger portion of the vehicle during the time it was parked on the lot was unreasonable. While it is true that defendant continued to own the car, it is also true that he parked the car on the lot without permission (express or implied), left intoxicating liquor in the car in open view, left the keys in the ignition, and failed to lock the doors. Under all these circumstances, we believe that defendant waived whatever legitimate expectation of privacy he had in the passenger part of the car and any claim to Fourth Amendment protection that would normally apply to this area. We therefore conclude that Officer Klopp did not violate defendant's Fourth Amendment rights in entering the car and looking in the bag, and that the court did not err in denying suppression.

Because we hold that the original search was legal, we do not reach the issue of whether, if the search was illegal, the second search was a product of the first.

▆▆▆ Also, there is no merit to defendant's contention that even if the original search was legal, the stakeout was improper and constituted an inducement to defendant to commit the crime. First of all, the police simply staked out defendant's car. They did not induce him to do anything. Second, entrapment is a predisposition-based of-

fense and even if there was police inducement, a defendant can be found guilty if he was predisposed to commit the crime.

2. Defendant's misconduct argument relates to a statement by the prosecutor in closing argument that Frerich was not a witness and that "we don't know what he'd say" if he were. Specifically, the prosecutor argued as follows:

"* * * [I]t's interesting to note that when the officer stopped the car and looked in it again that the Marijuana had moved from the back of the driver's seat to the back of the passenger's seat, and that there was some coats covering it. Obviously, it seems to me to some attempt was being made to hide it, cover it up.

"Now, who was doing that? Well, Mr. Frerichs was the passenger. Was it his Marijuana that Mr. Tungland just did not know anything about? We don't know. He's not here to testify. We don't know what he'd say, but does it make sense, does it make sense that Mr. Tungland would have that in his car, that he wouldn't know anything about it, and that when the police stopped him he wouldn't have engaged in some type of activity to try to cover it up."

This court has discouraged prosecutorial comment on or allusion to the failure of a defendant to call a witness or to the failure of a witness to testify when that witness would ordinarily be called by the defense if the witness' testimony were favorable to the defense. See, e. g., *State v. Caron*, 300 Minn. 123, 218 N.W.2d 197 (1974). As this court stated in *Caron*, there are two reasons for this:

"* * * First, such comment might suggest to the jury that defendant has some duty to produce witnesses or that he bears some burden of proof; second, the comment might erroneously suggest to the jury that defendant did not call the witnesses because he knew their testimony would be unfavorable." 300 Minn. 127, 218 N.W.2d 200.

However, as the state points out in its brief, this court has affirmed many convictions even though the prosecutor made such comments.

 Here the comment was rather innocuous and we doubt that the prosecutor was trying to suggest that defendant had any burden of proof or that the testimony would have been unfavorable to defendant. Further, although defendant objected at the conclusion of the argument and the court told the prosecutor he should not have made the statement, defense counsel did not seek a curative instruction. Finally, the instructions as given made it clear that the state had the burden of proof. Under the circumstances, we do not believe a reversal is mandated.

Affirmed.