**STATE of Minnesota, Respondent,**

**v.**

**William A. HODGE, Appellant.**

**No. C6–84–1016.**

Court of Appeals of Minnesota.

Feb. 12, 1985.

Review Denied April 26, 1985.

Hubert H. Humphrey, III, State Atty. Gen., Linda F. Close, Deputy Atty. Gen., St. Paul, for respondent.

C. Paul Jones, State Public Defender, Mary C. Cade, Conflict Atty., Minneapolis, for appellant.

Considered and decided by POPOVICH, C.J., and PARKER and FOLEY, JJ., with oral argument waived.

## OPINION

FOLEY, Judge.

Appellant William Hodge was convicted of kidnapping, Minn.Stat. § 609.25, subd. 1(4) (1982). On appeal, he claims the evidence was insufficient and that he was denied a fair trial due to several errors which occurred. We affirm.

## FACTS

Hodge met Robin Swensen in June 1983. Hodge was attending college in Yankton, South Dakota and Swensen had recently graduated and was living with her parents on their farm near Yankton. Concerned over the reaction her parents and the community would have of her dating a black man, Swensen kept the relationship a secret from her parents. Their relationship quickly became sexual.

In late July, the two discussed traveling to Chicago, Illinois. Their plans never developed however and during early August apparently Swensen felt Hodge was not spending enough time with her. Swensen had also been told that Hodge was dating another woman, Teresa Stock. Swensen made airline reservations to fly to Chicago by herself on August 17.

According to Swensen, on August 16 she drove to Yankton to meet Hodge. She was dressed in yellow shorts, T-shirt, short sleeved top and shoes. The two then picked up Teresa Stock and went swimming at a lake. Swensen was invited to go to Hinckley, Minnesota to pick up Hodge's final paycheck from a construction job. Swensen declined. Stock disclosed that she was "turning tricks" for Hodge and Hodge admitted that this was true.

About 7:00 p.m., after failing to find her car keys, Swensen asked for a ride back to her home. Swensen admitted she was jealous of Stock and was not pleased by Stock's presence. She slapped Hodge in the car and he struck her with his fist for several minutes. They drove into Nebraska, then went back to Yankton and stopped at Stock's house. They were there for about 10 to 15 minutes while Stock went in and changed clothes.

Instead of dropping Swensen off, Hodge said he had to take Stock to Vermillion. After driving past Vermillion, he said he was taking Stock to Sioux City, Iowa. They dropped Stock off at a motel and Swensen asked to go to Pam Dielstel's home. Dielstel wasn't home but they did find her at the Lucky Lady Bar.

Hodge and Swensen then picked up Stock and headed back to Yankton. By now it was around 1:00 a.m. Swensen observed Hodge and Stock whisper and overheard Stock mention that Swensen had not drunk very much liquor and that Hodge had done "some serious, but necessary ass kicking" on Swensen. After the car passed the Yankton exit, Swensen asked what was going on. Stock said Hodge better explain and Hodge told her they were going to Minneapolis and they were going to "sell your ass" along the way. Stock told Swensen "the first trick I ever turned was the toughest, but you'll get used it." Stock then mentioned they would have to get her some new clothes, like a mini skirt, because they like blondes in mini skirts in Minneapolis. Swensen was unable to unlock the door and leave the car.

In Lakefield, Minnesota at about 6:00 a.m. they ran out of gas. Swensen got out of the car and flagged down a truck driven

by Meryl Ostwald. She was then taken to the police.

Hodge testified and denied he and Stock kidnapped Swensen. He claimed Swensen had agreed to go with him and Stock to Hinckley, Minnesota. He also denied beating Swensen.

According to Hodge, when they drove to Sioux City, Stock was dropped off at a telephone booth so she could call her sister. When they ran out of gas in Lakefield, Swensen asked Hodge to move to Chicago with her and he told her he wanted to finish school in Yankton. Swensen became angry, got out, stopped a truck and then left with the truck driver. Hodge's defense counsel argued that Swensen was jealous of Stock, and needed an excuse which was palatable to her parents when she ended up at 6:00 a.m. on August 17 in a small Minnesota town with two blacks, without luggage or money.

Both Ostwald and Lakefield Chief of Police Randy Bush testified that Swensen appeared frightened and nervous on August 17. They also said Swensen's face was red, although neither observed any bruises on her face. Swensen initially refused to file a complaint but changed her mind and Hodge and Stock were both charged with kidnapping. Following a joint trial,[1] Hodge and Stock were found guilty. Hodge was sentenced to 24 months in prison, the presumptive sentence under the Minnesota Sentencing Guidelines.

## ISSUE

1. Was the evidence sufficient to convict Hodge?

2. Was Hodge denied a fair trial by the failure of the trial court to retire the jury for the night?

3. Was Hodge denied a fair trial by prosecutor misconduct in closing argument?

4. Was Hodge denied a fair trial by jury misconduct?

5. Was Hodge denied his constitutional rights by the impaneling of an all white jury?

## ANALYSIS

### I.

■ The jury was entitled to believe Swensen that at some point between Sioux City and Lakefield she was confined in the car without her consent for the purpose of holding her in involuntary servitude. Minn.Stat. § 609.25, subd. 1(4) (1982). Additionally, her testimony was somewhat corroborated by the testimony of Ostwald and Bush, who described Swensen's appearance and condition immediately after she left Hodge and Stock.

### II.

■ The jury retired for deliberations about 3:30 p.m. on February 10, 1984, and, following a dinner break, submitted questions about the evidence at approximately 8:00 p.m. The trial court, after consulting defense counsel, told the jury to rely on their memory.

About 9:15 p.m. the foreman indicated to the court that:

> Some of the people—It's been a hard long day and there are some of the people that say I just find it difficult to think straight anymore and they don't think that they could give an honest, do their work honestly and they were wondering if we could possibly retire and come back when our minds are clear.

After telling the foreman that arrangements will have to be made for a hotel or motel, the trial court stated:

> You can go back in the juryroom and discuss it. I don't want to keep you going if there are some of you that fear you just can't concentrate on it and do it. That isn't fair to you. That's not fair to the people involved in this lawsuit and it's important to them as you can well

1. In the companion case of *State v. Stock*, filed today, Stock contests the joint trial; Hodge raises no such objection.

understand, so I don't want to push you to that extent. If you think that going back there and just sort of adjourning your deliberations for awhile and just resting a little while, walk around in the juryroom, if that will help you, you can do that. If you feel that any of you feel that you just cannot give a good consideration to this, then we will put you in a motel, because you have the important work to do as I am sure you're well aware of and we want you to be in good condition so that you can analyze that evidence and you agree on it and you can return a just verdict so if you'd like to go back and discuss it, you may do so, and then tell the bailiff if you wish to come back here and then you can explain what you want to do.

The jury continued deliberating and returned with a guilty verdict around 10:30 p.m.

We do not believe the trial court erred in its handling of the matter. The trial court's response lacked any coerciveness which we indicated in *State v. Holly*, 350 N.W.2d 387 (Minn.Ct.App.1984), is a ground for reversal. The trial court did not charge the jury that they must decide the case at some time. *Id.* at 390. There is nothing showing the jury felt compelled to deliberate into the late hours of the night. Rather, a fair reading of the trial court's remarks shows a solicitous concern with the jury and with the defendant's rights. We do not believe the trial court "abdicated its obligation" to supervise conduct during trial or that it improperly "delegated its decision making power to the jury." *Holly* does not dictate a contrary result. *Holly* dealt with the non-sequestration of jurors overnight over defense objection.

### III.

In his closing argument, the prosecutor alluded to the failure of Teresa Stock's mother to testify that she gave Teresa $40 after the three had stopped at Stock's house in Yankton where Stock changed clothes. An objection by defense counsel was sustained and the trial court instructed the jury to disregard the comment. Prosecutorial comment on or allusion to the failure of defendants to call witnesses is discouraged. *State v. Caron*, 300 Minn. 123, 218 N.W.2d 197 (1974). The comment here cannot seriously be argued to be of substantial impact. Further, the jury was sufficiently admonished to disregard the comment, and was properly instructed on the burden of proof. *State v. Tungland*, 281 N.W.2d 646 (Minn.1979). We do not believe this comment was sufficiently serious as to deny appellant a fair trial.

### IV.

Following trial, a *Schwartz* hearing was held to determine if appellant was entitled to a new trial based on jury misconduct. *Schwartz v. Minneapolis Suburban Bus Co.*, 258 Minn. 325, 104 N.W.2d 301 (1960). The trial court heard evidence that a juror was seen on the last day of trial talking with Meryl Ostwald. The juror acknowledged this, but testified she did not talk to him except to say "Good Morning." The trial court denied appellant's motion for a new trial, finding the contact minimal and of no prejudice to appellant. The trial court noted that the juror admitted during voir dire that she knew Ostwald, as they lived in the same community and Ostwald had been a former mayor. We do not believe the trial court abused its discretion by denying appellant's motion for a new trial based on jury misconduct. *Stayberg v. Henderson*, 277 Minn. 16, 151 N.W.2d 290 (1967).

### V.

Appellant's personal claim that he was denied his constitutional rights by the impaneling of an all white jury is without merit. *See Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

### DECISION

The evidence was sufficient to convict appellant of kidnapping and appellant was not denied a fair trial.

Affirmed.