**STATE of Minnesota, Respondent,**

v.

**Wayne Thomas CARTER, Appellant,**

**Melvin Johns, Appellant.**

**Nos. CX–95–1368, C9–95–1765.**

Supreme Court of Minnesota.

July 15, 1999.

John M. Stuart, State Public Defender, Scott Swanson, Asst. State Public Defender, Minneapolis, Bradford Colbert, Asst. State Public Defender, St. Paul, for appellants.

Michael A. Hatch, Atty. Gen., St. Paul, James C. Backstrom, Dakota County Atty., Phillip D. Prokopowicz, Hastings, for respondent.

## OPINION

RUSSELL A. ANDERSON, Justice.

These cases return to us on remand from the United States Supreme Court. On September 11, 1997, we ruled that the police violated the constitutional rights of appellants, Wayne Thomas Carter and Melvin Johns, when an Eagan police officer stood 12 to 18 inches from a window of an apartment and looked through a gap in the blinds, spotting the appellants packaging cocaine in the kitchen with a woman who was later identified as Kimberly Thompson, the sole lessee of the apartment. We reversed the district court and the court of appeals, holding (1) that the search of the apartment was illegal and (2) that appellants had "standing" to challenge the search. *State v. Carter,* 569 N.W.2d 169, 171 (Minn.1997) (citing Fourth Amendment to the United States Constitution and Article I, Section 10 of the Minnesota Constitution).[1]   Three members of

---

1. Johns' conviction was reversed in *State v. Johns,* 569 N.W.2d 180 (Minn.1997) (reversing conviction based on the reasoning set forth in *State v. Carter,* 569 N.W.2d 169 (Minn.1997)).   Johns' conviction had been af-

firmed by the court of appeals in an unpublished opinion holding that the search by the police officer did not violate the Fourth Amendment.   *See State v. Johns,* No. C9–95–1765, 1996 WL 310305 (Minn.App. June 11,

this court dissented, agreeing with the majority that the search was illegal but contending that appellants did not have a legitimate expectation of privacy under the Fourth Amendment to challenge the search of Thompson's apartment. *Id.* at 179–81.

The United States Supreme Court granted review and, in a 5–4 decision delivered by Chief Justice Rehnquist, reversed this court, holding that appellants, as short-term business guests, did not have a legitimate expectation of privacy to challenge any search of Thompson's apartment. *Minnesota v. Carter,* 525 U.S. 83, 119 S.Ct. 469, 474, 142 L.Ed.2d 373 (1998). The Supreme Court differentiated between an overnight guest who may claim Fourth Amendment protection, see *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), and one who is "merely 'legitimately on the premises'" who may not. *Minnesota v. Carter,* 525 U.S. at ——, 119 S.Ct. at 473–74 (citing *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). The Supreme Court also noted that an expectation of privacy in commercial property is less than an expectation of privacy in a home. *Minnesota v. Carter,* 525 U.S. at ——, 119 S.Ct. at 474 (citing *New York v. Burger,* 482 U.S. 691, 700, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987)).

■ The Supreme Court remanded the case to this court. Although we referenced both the Fourth Amendment to the United States Constitution and Article I, Section 10 of our state constitution in our prior decision of *State v. Carter,* our analysis was based entirely on Supreme Court precedent interpreting the Fourth Amendment. Accordingly, we asked the parties to brief the issue of whether Article 1, Section 10 of the Minnesota Constitution affords the appellants greater protection

than provided by the Fourth Amendment to the United States Constitution as interpreted by the Supreme Court. We conclude, on the facts of this case,[2] that appellants' rights to challenge any search under Article I, Section 10 of the Minnesota Constitution are coextensive with appellants' rights under the Fourth Amendment to the United States Constitution. Therefore, we now hold that appellants do not have a legitimate expectation of privacy to challenge the search of the apartment under the Minnesota Constitution.

We reach this conclusion for two primary reasons. First, our decision in *State v. Carter* was predicated on an application of federal case law and implicit in our decision was the understanding that, on the facts of this case, any rights protected by the Minnesota Constitution were coextensive with the protections of the Fourth Amendment. Second, we are not persuaded in this case to accord greater protections under the state constitution than provided by the federal constitution.

Article I, Section 10 of the Minnesota Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated." This language is identical to the search and seizure language of the Fourth Amendment to the United States Constitution.

■ We have stated that a decision of the Supreme Court interpreting a provision of the United States Constitution that is identical to a provision of the Minnesota Constitution is "of inherently persuasive, although not necessarily compelling, force." *State v. Fuller,* 374 N.W.2d 722, 727 (Minn.1985); *see also State v. Hamm,* 423 N.W.2d 379, 382 (Minn.1988). We

---

1996). The majority and dissent in our prior decision in *State v. Carter* unanimously agreed that the officer's conduct violated the Fourth Amendment. 569 N.W.2d at 178–79. For the reasons stated in this opinion, the decision of the court of appeals in *State v. Johns* is affirmed on different grounds.

**2.** The salient facts concerning the search at issue were set out in *State v. Carter,* 569 N.W.2d 169 (Minn.1997), and reproduced as an appendix to this opinion.

may interpret the Minnesota Constitution to afford more protection than provided under the U.S. Constitution. *See Prune-Yard Shopping Center v. Robins*, 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) (explaining that states may "adopt in [their] own Constitution individual liberties more expansive than those conferred by the Federal Constitution") (citation omitted). We view with great import our role of protecting the rights of Minnesota's citizens:

> It is axiomatic that a state supreme court may interpret its own state constitution to offer greater protection of individual rights than does the federal constitution. Indeed, as the highest court of this state, we are " 'independently responsible for safeguarding the rights of [our] citizens.' " State courts are, and should be, the first line of defense for individual liberties within the federalist system.

*Fuller*, 374 N.W.2d at 726 (citations omitted). We have stated, however, that a decision to interpret the Minnesota Constitution differently than the federal constitution should not be made "cavalierly." *Id.*

On two occasions we have reached conclusions regarding Article I, Section 10 of the Minnesota Constitution that departed from decisions of the Supreme Court interpreting the identical language of the Fourth Amendment.[3] In so doing, we interpreted the Minnesota Constitution as according greater protection than the Supreme Court's interpretation of the Fourth Amendment because we viewed the Supreme Court's decisions as "radical" or "sharp" departures from precedent. In *In the Matter of the Welfare of E.D.J.*, we departed from Supreme Court precedent regarding what constitutes a "seizure" under the Minnesota Constitution, concluding

that the Supreme Court's decision in *California v. Hodari*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), represented a "sharp departure" from its previous decisions which warranted a separate, more protective standard under the Minnesota Constitution. 502 N.W.2d 779, 780 (Minn. 1993). One year after *E.D.J.*, we again departed from the Supreme Court, ruling in *Ascher v. Commissioner of Public Safety* that the Supreme Court's decision in *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), allowing the use of temporary road blocks to investigate driving under the influence, represented a "radical" departure from the previous rule. 519 N.W.2d 183, 186 (Minn.1994). We reiterated the long-standing requirement that police need an objective individualized articulable suspicion of criminal wrongdoing before making an investigative stop in Minnesota. *See id.* at 187.

We are not persuaded by appellants' arguments that the Supreme Court's analysis in this case represents a radical or sharp departure from Supreme Court precedent. The Supreme Court's decision in this case is a logical extension of *Minnesota v. Olson*, which held that an overnight guest could claim the protection of the Fourth Amendment in the home of another while a person merely "legitimately on the premises" may not. 495 U.S. at 98, 110 S.Ct. 1684.

In this case, the Supreme Court reasoned that the "purely commercial nature of the transaction engaged in here, the relatively short period of time on the premises, and the lack of previous connection between [appellants] and the householder, all lead us to conclude that [appellants'] situation is closer to that of one simply permitted on the premises."

---

**3.** We recently declined to extend additional protection under the Minnesota Constitution in a case dealing with an illegal seizure. *See State v. Harris*, 590 N.W.2d 90 (Minn.1999); *see also State v. Cripps*, 533 N.W.2d 388, 391 (Minn.1995) (citing both *In the Matter of the Welfare of E.D.J.*, 502 N.W.2d 779 (Minn.

1993) and *Ascher v. Commissioner of Public Safety*, 519 N.W.2d 183 (Minn.1994) in holding that defendant was seized "within the meaning of Article 1, Section 10" of the Minnesota Constitution while not mentioning the Fourth Amendment to the United States Constitution).

*Minnesota v. Carter*, 525 U.S. at ——, 119 S.Ct. at 474.[4] Unlike our decisions in *E.D.J.* and *Ascher*, we are not convinced that a separate rule is necessary under the Minnesota Constitution. Today's decision is consistent with our previous decisions analyzing whether a defendant has a legitimate expectation of privacy in the place searched. We have said on numerous occasions that a defendant who cannot demonstrate a legitimate expectation of privacy relating to the area searched or the item seized may not contest the legality of the search or seizure. *See, e.g., State v. Richards*, 552 N.W.2d 197, 204 (Minn.1996) (citing *Rakas*, 439 U.S. at 138–48, 99 S.Ct. 421); *State v. Tungland*, 281 N.W.2d 646, 649 (Minn.1979) (also citing *Rakas* ).

In our prior opinion in *State v. Carter* we relied exclusively on United States Supreme Court precedent in interpreting the scope of Fourth Amendment protection as applied to the facts of these cases, with the implicit conclusion that the scope of Article I, Section 10 was coextensive in these circumstances. On remand, confronted with the same facts, our conclusion that the protections afforded by Article I, Section 10 of the Minnesota Constitution should be coextensive with the protections of the Fourth Amendment to the United States Constitution has not changed.

Therefore, in accordance with the United States Supreme Court decision in *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), the judgments of this court in *State v. Carter*, 569 N.W.2d 169 (Minn.1997), and in *State v. Johns*, 569 N.W.2d 180 (Minn.1997), are hereby vacated. The judgment of the court of appeals in *State v. Carter*, 545 N.W.2d 695 (Minn. App.1996), is affirmed. The judgment of

the court of appeals in *State v. Johns*, No. C9–95–1765, 1996 WL 310305 (Minn.App. June 11, 1996) (holding that search by police officer did not violate the Fourth Amendment) is affirmed on different grounds consistent with this opinion.

Affirmed.

Concurring specially, Anderson, Paul H., J.

### APPENDIX

The following facts were recited in our opinion in *State v. Carter*, 569 N.W.2d 169, 171–73 (Minn.1997):

"At approximately 8 p.m. on the evening of May 15, 1994, an anonymous informant approached Eagan police officer Jim Thielen. The informant, whom Thielen never had seen before, told Thielen that he/she had walked by apartment 103 at 3943 South Valley View Drive and observed people sitting around a table inside the apartment 'bagging' a white powder. The informant also told Thielen that he/she believed the occupants of the apartment had used a blue four-door Cadillac located in the parking lot adjacent to the apartment complex. The informant also told Thielen that the car had an Illinois license plate that read SGD 896. In response to this information, Thielen went to the complex and approached the ground floor window of apartment 103. Thielen then walked toward the window of the apartment by leaving the common sidewalk that led to the apartment building's entrance and stepping on a grassy common area closer to the window. Thielen then walked behind some short bushes located in front

---

4. Justice Kennedy, concurring in *Minnesota v. Carter*, described the nature of appellants visit to the apartment, observing:

In this case [appellants] have established nothing more than a fleeting and insubstantial connection with Thompson's home. For all that appears in the record, [appellants] used Thompson's house simply as a convenient processing station, their purpose involving nothing more than the me-

chanical act of chopping and packaging a substance for distribution. There is no suggestion that [appellants] engaged in confidential communications with Thompson about their transaction. [Appellants] had not been to Thompson's apartment before, and they left it even before their arrest. 525 U.S. 83, 119 S.Ct. 469, 479, 142 L.Ed.2d 373 (1998) (Kennedy, J., concurring).

of the apartment window and stood approximately 12 to 18 inches from the window. The window's blinds were drawn closed, but gaps in the blinds allowed Thielen to observe activity in the apartment. While looking through the gaps in the blinds, Thielen observed two males and one female sitting at a kitchen table. One of the males appeared to be placing a white powdery substance onto the kitchen table. This person then would pass the white substance to the second male who then would place the powder into a plastic bag. The second male, who was wearing bedroom slippers, would in turn give the plastic bag to the female who would cut off the ends of the bag and place it on the table.

"After observing this activity for approximately 15 minutes, Thielen left the apartment complex and went to a nearby fire station where he had another conversation with the informant and another Eagan police officer. At this time the informant told the officers that the people inside the apartment might be in possession of a gun. Thielen then returned to the apartment complex where he located a Cadillac matching the description given by the informant. He then returned to the fire station, telephoned Officer Kevin Kallestad of the South Metro Drug Task Force, and reported what he had seen. Kallestad instructed Thielen to stop and secure the suspect vehicle should anyone attempt to drive it away. Police also began to prepare affidavits as part of a request for warrants to search both the apartment and the Cadillac.

"At approximately 10:30 p.m., an Eagan police officer observed two males putting items into the suspect Cadillac. The two males then entered the vehicle and started to drive it out of the parking lot. As per instructions, Eagan police stopped the vehicle at the intersection of Rahn Road and Beau de Rue Drive. The police found Carter in the driver's seat and Melvin Johns in the passenger's seat. The police

ordered both men out of the car. As the police opened the door to let Johns out of the car, they observed a black zippered pouch and a handgun, later determined to be loaded, on the floor of the vehicle. The police then placed Carter and Johns under arrest. The police subsequently towed the Cadillac to the Eagan Police Department, and after receiving the signed search warrant at approximately 1:30 a.m. on May 16, the police searched the vehicle. When the officers opened the black zippered pouch, they discovered a white mixture in plastic baggies, Johns' identification, pagers, and a scale. Tests later determined that the white mixture was 47.1 grams of cocaine.

"Late in the evening of May 15, after the arrests of Carter and Johns, Eagan police returned to apartment 103 and arrested its occupant, Kimberly Thompson. At approximately 3 a.m. on May 16, police executed a search warrant on the apartment and located cocaine residue on the kitchen table and plastic baggies consistent with those found in the automobile driven by Carter. Thielen subsequently identified Carter, Johns and Thompson as the individuals he had observed in the apartment packaging the white mixture. He identified Carter as the individual he had seen putting the white mixture on the table and dividing it into piles, Johns as the man who wore slippers and placed the piles into baggies, and Thompson as the individual who cut the ends off the baggies and placed the baggies in piles. Police ultimately learned that Carter and Johns were residents of Chicago, Illinois, and that Thompson was the sole lessee of apartment 103. Subsequent to his arrest, Carter made a statement to the police in which he admitted ownership of a duffel bag found inside the Cadillac. A search of the duffel bag uncovered a digital gram scale containing traces and residue of cocaine. Johns made a statement to the police admitting he had accepted a proposal to transport cocaine from Illinois to Minnesota for money, and that he, Carter, and Thompson had packaged the cocaine at Thompson's apartment. He also admit-

ted that there were approximately two ounces of crack cocaine and a handgun in the vehicle."

PAUL H. ANDERSON, J. (concurring specially).

I concur in the result reached by the majority to the limited extent that the holding of the United States Supreme Court in *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), mandates a holding by our court that, under the specific facts of this case, Carter and Johns did not have an expectation of privacy under either the Fourth Amendment to the United States Constitution or Article 1, Section 10 of the Minnesota Constitution.

PAGE, Justice (dissenting).

I respectfully dissent. On remand from the United States Supreme Court, the court now holds that Carter and Johns did not have a reasonable expectation of privacy under the Minnesota Constitution to challenge the search of the apartment. Surely their presence in an apartment with the blinds drawn and the windows and doors closed gave them an expectation of privacy that was reasonable. I would therefore hold that they did have such an expectation. The justification for the court's opinion is that the language of Article I, Section 10 of the Minnesota Constitution is identical to the search and seizure language of the Fourth Amendment of the United States Constitution under which the Supreme Court, in a 5–4 decision, concluded that Carter and Johns had no reasonable expectation of privacy. However, "[w]hether the state constitution has language similar to that of the federal Constitution or not, states are free to interpret their own constitutions" to provide greater protection for individual rights than minimally provided by the federal Constitution. *Friedman v. Commissioner of Pub. Safety*, 473 N.W.2d 828, 836 (Minn.1991) (citing *State v. Fuller*, 374 N.W.2d 722, 726 (Minn. 1985)); *see also PruneYard Shopping Cen-*ter v. Robins, 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). Based on the facts of this case, I see no reason why we should not afford the citizens of Minnesota greater protection from governmental intrusion than currently afforded by the federal constitution.

While the Supreme Court has set forth an albeit different rule regarding an individual's reasonable expectation of privacy, the Court has not necessarily set forth the better rule. The Supreme Court's limit on Carter and Johns' expectation of privacy as adopted by our court appears to turn on the fact that they were engaged in an *illegal* commercial activity. If we similarly base our jurisprudence regarding the expectation of privacy wholly on the type of conduct involved, then we will inevitably limit the meaning of the search and seizure provision of our constitution to provide protection only for those engaging in activities we find acceptable. I do not believe an individual's reasonable expectation of privacy is so narrow. *See Friedman*, 473 N.W.2d at 830 (stating that "states have been particularly attentive to the protection of those citizens accused of crimes"). Where it is a close question of whether an individual's expectation of privacy is reasonable, as evidenced by the narrow 5–4 majority, there is no compelling reason to blindly follow the Supreme Court's lead to provide less protection for Minnesota citizens. The Supreme Court recognized the broader reach of the protection against unreasonable searches and seizures even in a "commercial" setting in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (involving a defendant who was convicted of transmitting wagering information by telephone across state lines). In concluding that the government's eavesdropping activities violated the petitioner's reasonable expectation of privacy, the Court stated that "what [an individual] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Id.* at 351–52, 88 S.Ct. 507. We should extend that protection here.

If I am incorrect and it is not the illegal nature of the conduct that drives today's decision, then every Minnesotan has lost their reasonable expectation of privacy because the limits placed on the reasonableness of one's expectation of privacy that the court announces today represents the maximum level of protection that Minnesota citizens can expect. Minnesota citizens visiting another person's home for whatever purpose will be surprised to learn that under our law they no longer have an expectation of privacy in that home. Our citizens deserve more.