315 So.2d 487 (1975)
Louis OLIVERA, Appellant,
v.
STATE of Florida, Appellee.
No. 74-925.
District Court of Appeal of Florida, Second District.
June 18, 1975.
Rehearing Denied July 15, 1975.
W. Daniel Kearney, of Kearney, Matthews & Mulock, Palmetto, for appellant.
Robert L. Shevin, Atty. Gen., Tallahassee, and Davis G. Anderson, Jr., Asst. Atty. Gen., Tampa, for appellee.
GRIMES, Judge.
The court below denied a motion to suppress. Thereafter, the appellant pled nolo *488 contendere reserving his right to appeal pursuant to State v. Ashby, Fla. 1971, 245 So.2d 225.
Deputies Metcalfe and Boomhower were working undercover for the Manatee County Sheriff's Department. On April 10, 1974, at approximately 1:00 a.m., Metcalfe purchased some cocaine outside a commercial establishment on U.S. Highway 41. After making the purchase, Metcalfe agreed to return with some of those persons present at the transaction to an apartment where he had been earlier in the evening. Metcalfe entered the store on the pretext that he was going to buy some beer. While the others waited in a car outside, Metcalfe quickly telephoned Boomhower who was at home asleep. Metcalfe testified that he called Boomhower:
"... to  have him pick me up, and the second reason was that I was unarmed and there might be some problems if I went back to the apartment. And the third reason was to make any arrests if we decided at that time to make arrests."
Metcalfe told Boomhower the location of the apartment complex. He did not know the apartment number, so he told Boomhower to go to the "apartment building on the left, the west end apartment."
Deputy Boomhower then drove to the apartment complex and proceeded to the "west building, last apartment on the left." He went to the front door and heard voices inside. He then proceeded to a bedroom window near or at the back of the apartment. In doing so, he left the sidewalk and walked across some grass. He explained that he went to the window to try to ascertain what was going on inside before making his entrance. He indicated that he did this for his own protection and to ascertain if there were any other exits. As Boomhower approached the window, he smelled the aroma of cannabis coming from it. A blanket covered the window, but Boomhower could make out silhouettes through it. The window was opened out a few inches, and Boomhower remained at the window for five to eight minutes with his ear up to the opening. While he listened, he heard what appeared to be the sale of some cocaine.
Boomhower then called a back-up unit, and, after it arrived, he returned to the front door and knocked. Boomhower was armed, but casually dressed. When the door was answered by a male, Boomhower asked if "Dave was there" and told the person that Dave had told him he [Boomhower] could get some "coke" there. The individual at the door became nervous and told Boomhower, "Dave isn't here ... get the hell out of here" and started to slam the door. Boomhower pushed the door open and yelled "Sheriff's Department" as he entered. Boomhower testified that he was concerned for Metcalfe's safety:
"... We have been taught to be extremely cautious with people doing cocaine. He was in there alone. There seemed to be more people than he could handle by himself. Dave's kind of small, you know. These were the reasons, just concern for his safety."
Boomhower said, however, that he had no evidence that Metcalfe was in danger.
After entering, Boomhower viewed drugs and paraphernalia and placed those present under arrest. "The evidence which led to the on-view arrest, let's say, was all over the top of the dresser." As it turned out, the apartment Boomhower entered was not the apartment to which Metcalfe had directed him. Metcalfe was in another apartment in another building.
The seizure can only be sustained if Boomhower had probable cause either to search the premises involved or to make an arrest of the persons therein. Even assuming the exigent circumstances necessary for a search without a warrant, the other requirements for making such a *489 search cannot be less than that necessary to search with a warrant. For a search warrant to be sufficient, the description must lead the officer unerringly to the subject premises. State v. Lemon, Fla.App.2d, 1968, 212 So.2d 322. Likewise, the requirements of reliability and particularity of information on which an officer may arrest without a warrant are at least as stringent as those required for an arrest with a warrant. Wong Sun v. United States, 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441. The information Boomhower received from Metcalfe could not constitute probable cause either to search or to arrest persons in the wrong apartment. Therefore, the probable cause, if any, must have come about by reason of Boomhower's having overheard the sale of cocaine and having smelled the cannabis. Consequently, we must decide whether Boomhower's "plain view" discoveries were made from a place where he had a right to be.[1]
Wherever an individual harbors a "reasonable expectation of privacy," he is entitled to be free from unreasonable governmental intrusion. Terry v. Ohio, 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. In Katz v. United States, 1967, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576, the U.S. Supreme Court said, "the Fourth Amendment protects people, not places," and observed that the reach of the amendment does not turn upon the presence or absence of a physical intrusion into any given enclosure. The court added that what a person seeks to preserve as private may be constitutionally protected despite the fact that it is in an area accessible to the public.
The activities of the police in the case sub judice bear some resemblance to that of the authorities in Brock v. United States, 5th Cir.1955, 223 F.2d 681, and State of Texas v. Gonzales, 5th Cir.1968, 388 F.2d 145. In Brock, federal agents, without probable cause, went upon the defendant's property and stood outside his bedroom window from which point one of the agents talked to the defendant as he slept. In his sleep, the defendant made incriminating statements to the agent. One of the reasons the court gave for reversing the conviction for a moonshine liquor violation was that by appearing outside the bedroom window the agents had violated defendant's Fourth Amendment rights. The court said:
"... Whatever quibbles there may be as to where the curtilage begins and ends, clear it is that standing on a man's premises and looking in his bedroom window is a violation of his `right to be let alone' as guaranteed by the Fourth Amendment... ." 223 F.2d at 685.
In Gonzales, supra, police officers, without probable cause, made repeated trips to the windows of the house in which the respondent was arrested. By peering through the windows, the police obtained the necessary probable cause to search. In affirming the granting of a petition for habeas corpus, the court said that the essence of the Fourth Amendment is "protection against arbitrary intrusions into the privacies of life" and that peering in the windows of a dwelling without probable cause to believe that a crime was being committed or had been committed therein was such an intrusion.
While not dealing with observations made through a window, the case of Fixel v. Wainwright, 5th Cir.1974, 492 F.2d 480, is also pertinent. The petitioner lived in a four-unit apartment building. Without a warrant, police entered the backyard of the building which was surrounded by a chain-link fence. There they discovered the heroin for the possession of which petitioner was convicted. In reversing the denial of habeas corpus, the court said that the backyard was not a common passageway *490 normally used by the tenants for gaining access to the apartments or by businessmen who might approach the tenants in the course of their trade. The court said:
"... While the enjoyment of his backyard is not as exclusive as the backyard of a purely private residence, this area is not as public or shared as the corridors, yards or other common areas of a large apartment complex or motel. Contemporary concepts of living such as multi-unit dwellings must not dilute Fixel's right to privacy any more than is absolutely required. We believe that the backyard area of Fixel's home is sufficiently removed and private in character that he could reasonably expect privacy. .. ." (Emphasis added.) 492 F.2d at 484.
On the other hand, in Ponce v. Craven, 9th Cir.1969, 409 F.2d 621, police officers went to a motel after the manager reported suspicious activity by the defendant, one of the motel's guests. The police, while standing in the motel parking lot, looked through the bathroom window of the defendant's motel room and observed a man washing out a hypodermic needle. The court concluded that evidence subsequently seized was admissible because the police officers were in the parking lot legally and because the defendant's reliance on privacy was not reasonable in that he failed to draw the curtains. The court said:
"`A private home is quite different from a place of business or from a motel cabin. A home owner or tenant has the exclusive enjoyment of his home, his garage, his barn or other buildings, and also the area under his home. But a transient occupant of a motel must share corridors, sidewalks, yards, and trees with the other occupants. Granted that a tenant has standing to protect the room he occupies, there is nevertheless an element of public or shared property in motel surroundings that is entirely lacking in the enjoyment of one's home.'
"In this case police officers made their observations of Ponce's bathroom window from the motel parking lot, which was for the use of guests and persons having business at the motel. The parking lot was an area to which many people had access; it was an area to which the appellant, as an occupant of the motel, had only shared property." 409 F.2d at 624.
Likewise, in State v. Clarke, Fla.App.4th, 1970, 242 So.2d 791, police responded to the call of an apartment complex manager who requested that officers be sent to investigate illegal use of drugs in one of the apartments. One officer ascended a fire escape and assumed a position outside appellee's window. Through the window the officer observed drugs and paraphernalia. In reversing the trial court's order granting defendant's motion to suppress, the court pointed out that the apartment manager had impliedly granted the police permission to ascend the fire escape so as to make the officer's presence there legal and proper. The court reasoned that because the fire escape was open to use by others, the occupants of the apartment could not reasonably expect privacy in relation to that which was observable from the fire escape. The court continued:
"... They had no yard surrounding the premises which they could reasonably expect to protect their windows from visual intrusions by strangers... ."
By way of a footnote, the court distinguished Brock and Gonzales in that in those cases, as in the case sub judice, police officers had to cross a portion of yard in order to look in the window. The court said that in those cases the occupants had a reasonable expectation that their activities inside the residence would remain private and out of the view of passersby.
*491 By the same token, appellant could reasonably expect that no one would observe or overhear his activities in the apartment from the bedroom window. In leaving the sidewalk to stand on the lawn next to the window, Deputy Boomhower invaded appellant's privacy. By doing so, without any probable cause, Boomhower went to a place where he did not have a right to be. The knowledge thereby obtained was tainted and could not constitute the probable cause necessary to sustain the state's position. Regardless of Boomhower's good faith, the implications of sanctioning police surveillance by standing in a yard at one's window in the middle of the night are too obvious to require elaboration.[2]
The judgment and sentence are hereby reversed, and the case is remanded for further proceedings consistent herewith.
McNULTY, C.J., and SCHEB, J., concur.
NOTES
[1] Appellant's contention that Boomhower's "plain view" discoveries cannot be sustained because they were not inadvertent is without merit. State v. Flores, Fla.App.2d 1974, 305 So.2d 292.
[2] In view of our disposition of this case, we need not pass on appellant's further contentions that assuming probable cause, (1) a search warrant should have been procured, and (2) there was a failure of compliance with Fla. Stat. § 901.19.