**STATE of Minnesota, Respondent,**

**v.**

**John Allen KRECH,**
**Petitioner, Appellant.**

**No. C3–86–1527.**

Supreme Court of Minnesota.

April 10, 1987.

Paul W. Rogosheske, South St. Paul, for appellant.

Washington County Atty's. Office, Robert W. Kelly, Co. Atty., Louise Trant Dobbe, Asst. Co. Atty., Stillwater, for respondent.

AMDAHL, Chief Justice.

We granted the petition of defendant John Allen Krech for review of a decision of the Court of Appeals that reversed a pretrial order suppressing evidence in the prosecution of him for possession of cocaine and for possession of cocaine with intent to distribute it. The prosecution is based on evidence discovered in a warranted search of defendant's residence and on admissions that defendant made after he was arrested. The trial court suppressed the evidence, reasoning that the affidavit in support of the warrant application did not accurately summarize all the information bearing on the probable cause determination and also contained information that was obtained in two illegal warrantless searches of defendant's garbage. The Court of Appeals reversed the suppression order and remanded for trial. *State v. Krech*, 399 N.W.2d 203 (Minn.App.1987). It ruled that one of the two garbage searches was legal, that any factual inaccuracy in the affidavit was insignificant, and that the affidavit contained sufficient lawfully obtained information to support the issuance of a warrant. We agreed to review the Court of Appeals' decision in order to clarify the circumstances under which the police may seize and search garbage set out for collection.

Defendant lives with his girl friend and an infant in a rental ground floor duplex apartment. On the evening of January 16, 1986, Robert Cross, a part-time St. Paul Park police officer, was in the upstairs duplex apartment with his former girl friend's child. Over a 5–hour period he observed "numerous" people drive up in cars, stop, enter defendant's duplex through the back door, stay for 3 or 4 minutes, then leave. Cross also works part-time as a "hired police officer" at a number of liquor establishments. In this capacity he had received information that defendant, whom he has known all his life, was dealing drugs. Cross told David Hiles, the chief of police, about his observations at the apartment and about the information he had received at the liquor establishments. Hiles talked with another officer, Byron Olson, who said he had received similar information about defendant. Hiles asked Cross if he could pick up defendant's garbage bags after defendant put them outside for collection. Cross said that he could because he was at the duplex frequently.

As instructed by his landlord, defendant typically wrapped his garbage in plastic bags and put the bags in cans in back of the duplex a few feet away from the alley. We are concerned with two different searches of garbage placed by defendant in these cans. The first search involved Cross walking out the back door of the duplex and seizing an empty cardboard UPS box that defendant had left unwrapped in one of the garbage cans. The box, which was addressed to defendant, contained a return address for Main Labs, Inc., in Toledo, Ohio. Officer Byron Olson immediately called Main Labs and learned that the box contained 3–ounce packets of a powdered food supplement; Officer Olson was aware that powdered food supplements are used by many drug dealers to "cut" controlled substances such as cocaine before sale. Later that day Cross was directed to return and seize the rest of defendant's garbage, which was wrapped in plastic bags. These bags were taken to the police station and searched. In them police found 18 white "bindles," small pieces of folded paper in which controlled substances are packaged for sale. Some of these bindles contained traces of cocaine and notations indicating that they had contained certain amounts (½ gram

and ¼ gram) of cocaine. Based on all the above information, police obtained the search warrant.[1]

The Court of Appeals distinguished the two searches, reasoning that defendant had no reasonable expectation of privacy in the UPS box and that he did have a reasonable expectation of privacy in the garbage he placed in the opaque garbage bags. *State v. Krech*, 399 N.W.2d 203, 205 (Minn.App. 1987). The court then reasoned that the totality of information that was lawfully obtained—the information Cross received at the bars, the observations he made when he was babysitting, and the information obtained from seizing the UPS box—established probable cause justifying the issuance of the search warrant. 399 N.W.2d at 206–07.

Relevant garbage-search cases include: *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960) (holding that when a person checked out of a motel, leaving behind certain items in the waste basket of his room, he had abandoned the property and thereby lost any fourth amendment right to privacy in the property); *United States v. Michaels*, 726 F.2d 1307, 1312 (8th Cir.), *cert. denied*, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984) (denying fourth amendment protection to "trash placed for collection in a public area, in close proximity to a public way, or in an outdoors communal trash container serving an apartment building"); *State v. Dreyer*, 345 N.W.2d 249 (Minn.1984) (holding that police did not violate defendant's fourth amendment rights in seizing and searching three plastic bags full of garbage which defendant had put out for collection at the curb at the edge of his driveway); and *State v. Oquist*, 327 N.W.2d 587 (Minn. 1982) (holding that defendant had no reasonable expectation of privacy in the contents of plastic bags placed in or near his open garbage cans and that the police did not violate his fourth amendment rights in

seizing and searching the bags where they were able to do so without trespassing on the defendant's property).

■ We do not believe that the Court of Appeals' distinction between the UPS box and the three plastic bags is reasonable. We believe instead that under the cases the property in question—the box as well as the bags—was abandoned property in which defendant no longer had a reasonable expectation of privacy.

■ The real issue is whether the police violated defendant's fourth amendment rights in going onto the land in order to seize the abandoned property. We conclude that they did not violate defendant's rights in doing this.

In reaching this conclusion, we start with the United States Supreme Court's recent decision in *United States v. Dunn*, —— U.S. ——, ——, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987), where the court stated:

[In *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)] we recognized the Fourth Amendment protects the curtilage of a house and that the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself. 466 U.S., at 180 [104 S.Ct. at 1742]. We identified the central component of this inquiry as whether the area harbors the "intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Ibid.* (quoting *Boyd v. United States*, 116 U.S. 616, 630 [6 S.Ct 524, 532, 29 L.Ed. 746] (1886)).

Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity

---

**1.** The alleged misstatement in the affidavit supporting the application for the search warrant related to a statement by the affiant, Officer Olson, that he had received information from concerned citizens about defendant selling drugs. In fact, it was Cross, not Olson, who had received the information from the concerned citizens. We agree with the Court of Appeals that the misstatement was insignificant and immaterial. *See Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. [Citations omitted.] We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a "correct" answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.

In *Dunn,* the Court concluded that an area of a ranch near a barn, which was located approximately 50 yards from a fence surrounding the ranch house and 60 yards from the house itself, was not, for fourth amendment purposes, within the curtilage of the house.

We deal here with the back yard of a duplex in a suburban neighborhood. As Professor LaFave states, "it is a fair generalization that the lands adjoining a multiple-occupancy residence are less likely to receive Fourth Amendment protection than the yard of a single-family residence" because "the privacy expectation as to such an area is often diminished because it is not subject to the exclusive control of one tenant and is utilized by tenants generally and the numerous visitors attracted to a multiple-occupancy building." 1 W. LaFave, Search and Seizure § 2.3(f) at 414 (1987).

Next, we note that, as we held in *State v. Crea,* 305 Minn. 342, 346, 233 N.W.2d 736,

739 (1975), certain areas surrounding a dwelling are "impliedly open to use by the public. Thus, police may walk on the sidewalk and onto the porch of a house and knock on the door if they are conducting an investigation and want to question the owner * * *." *Id.* Stated differently, police do not need a warrant or even probable cause to approach a dwelling in order to conduct an investigation if they "restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches) * * *." 1 W. LaFave, Search and Seizure § 2.3(f) at 412 (1987).[2]

Thirdly, it appears that defendant was using his residence also as a commercial outlet for drugs and that his customers typically walked near the garbage on the way to the back entrance, facts that further suggest a diminished expectation of privacy by petitioner in the area where the garbage was placed. In *Dunn,* the Court stated that it was "especially significant" that the police possessed objective data indicating that the barn was not being used for intimate activities of the home but was being used in the unlawful manufacture of elicit drugs. 107 S.Ct. at 1139–1140; *cf., Dow Chemical Co. v. United States,* —— U.S. ——, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986) (holding that for purposes of aerial surveillance using sophisticated equipment, the open areas of an industrial or business complex are not analogous to the curtilage of a dwelling but falls somewhere between "open fields" and curtilage).[3]

All these factors combine to persuade us that defendant did not have a reasonable (or even an actual) expectation that the area where the garbage cans were located would be treated as a dwelling is treated

2. The fact that some people have access to certain areas surrounding a dwelling does not mean that those areas are impliedly open to use by the public. For example, a homeowner may give a garbageman permission to enter into an area to collect garbage without necessarily impliedly opening the area to other members of the public.

3. We have relied on the fact that a person is using a residence as a drug outlet in contexts unrelated to this one, *e.g., State v. Lien,* 265 N.W.2d 833, 839–40 (Minn.1978) (suggesting that one fact which might justify authorizing an unannounced entry clause in a warrant to search a dwelling is the fact that the dwelling is being used as a drug outlet). We do not suggest that the fact that defendant was using his house as a drug outlet meant that the dwelling itself was thereby stripped of Fourth Amendment protection.

for fourth amendment purposes.[4] Accordingly, we conclude that the police did not violate defendant's fourth amendment rights in going onto that area in order to seize the abandoned property.

Affirmed as modified.

---

**4.** Even if the area in question deserved protection under the fourth amendment identical to that given the defendant's dwelling, one might uphold the seizures in this case on the theory that Cross, by virtue of his relationship with the upstairs tenant, had implied authority to enter the part of the property where the garbage cans were located. However, we need not and do not decide this point.