STATE of Minnesota, Respondent,

v.

Wayne Thomas CARTER,
petitioner, Appellant.

No. CX–95–1368.

Supreme Court of Minnesota.

Sept. 11, 1997.

Scott Swanson, Assistant State Public Defender, Minneapolis, for Appellant.

Hubert H. Humphrey III, Attorney General, St. Paul, James C. Backstrom, Dakota County Attorney by Phillip D. Prokopowicz, Assistant Dakota County Attorney, Hastings, for Respondent.

## OPINION

TOMLJANOVICH, Justice.

By looking through the gaps in the closed blinds covering a window, a police officer observed the appellant, Wayne Thomas Carter, as he engaged in a drug-packaging operation with two other persons, one of whom was the leaseholder of the apartment. The district court held that Carter, who was an out-of-state visitor, did not present any evidence to establish his standing to contest the legality of the observation. The court also concluded that the officer did not conduct a search because he made the observations from an area where Carter did not have a reasonable expectation of privacy. The court of appeals affirmed the district court, but based its holding only on the finding that Carter did not have standing to bring a motion to suppress any evidence obtained from the officer's observations. We reverse, and hold that the evidence was sufficient to establish that Carter had standing to challenge the legality of the observation. We further hold that the officer's observation rose to the level of a search, and that the officer's lack of probable cause and a warrant rendered the search unreasonable under the Fourth Amendment of the United States Constitution, and Article I, Section 10 of the Minnesota Constitution.

At approximately 8 p.m. on the evening of May 15, 1994, an anonymous informant approached Eagan police officer Jim Thielen. The informant, whom Thielen never had seen

before, told Thielen that he/she[1] had walked by apartment 103 at 3943 South Valley View Drive and observed people sitting around a table inside the apartment "bagging" a white powder. The informant also told Thielen that he/she believed the occupants of the apartment had used a blue four-door Cadillac located in the parking lot adjacent to the apartment complex. The informant also told Thielen that the car had an Illinois license plate that read SGD 896. In response to this information, Thielen went to the complex and approached the ground floor window of apartment 103. Thielen then walked toward the window of the apartment by leaving the common sidewalk that led to the apartment building's entrance and stepping on a grassy common area closer to the window. Thielen then walked behind some short bushes located in front of the apartment window and stood approximately 12 to 18 inches from the window. The window's blinds were drawn closed, but gaps in the blinds allowed Thielen to observe activity in the apartment. While looking through the gaps in the blinds, Thielen observed two males and one female sitting at a kitchen table. One of the males appeared to be placing a white powdery substance onto the kitchen table. This person then would pass the white substance to the second male who then would place the powder into a plastic bag. The second male, who was wearing bedroom slippers, would in turn give the plastic bag to the female who would cut off the ends of the bag and place it on the table.

After observing this activity for approximately 15 minutes, Thielen left the apartment complex and went to a nearby fire station where he had another conversation with the informant and another Eagan police officer. At this time the informant told the officers that the people inside the apartment might be in possession of a gun. Thielen then returned to the apartment complex where he located a Cadillac matching the description given by the informant. He then

returned to the fire station, telephoned Officer Kevin Kallestad of the South Metro Drug Task Force, and reported what he had seen. Kallestad instructed Thielen to stop and secure the suspect vehicle should anyone attempt to drive it away. Police also began to prepare affidavits as part of a request for warrants to search both the apartment and the Cadillac.

At approximately 10:30 p.m., an Eagan police officer observed two males putting items into the suspect Cadillac. The two males then entered the vehicle and started to drive it out of the parking lot. As per instructions, Eagan police stopped the vehicle at the intersection of Rahn Road and Beau de Rue Drive. The police found Carter in the driver's seat and Melvin Johns in the passenger's seat. The police ordered both men out of the car. As the police opened the door to let Johns out of the car, they observed a black zippered pouch and a handgun, later determined to be loaded, on the floor of the vehicle. The police then placed Carter and Johns under arrest. The police subsequently towed the Cadillac to the Eagan Police Department, and after receiving the signed search warrant at approximately 1:30 a.m. on May 16, the police searched the vehicle. When the officers opened the black zippered pouch, they discovered a white mixture in plastic baggies, Johns' identification, pagers, and a scale. Tests later determined that the white mixture was 47.1 grams of cocaine.

Late in the evening of May 15, after the arrests of Carter and Johns, Eagan police returned to apartment 103 and arrested its occupant, Kimberly Thompson.[2] At approximately 3 a.m. on May 16, police executed a search warrant on the apartment and located cocaine residue on the kitchen table and plastic baggies consistent with those found in the automobile driven by Carter. Thielen subsequently identified Carter, Johns and Thompson as the individuals he had observed in the apartment packaging the white mixture. He

---

1. Thielen testified at the omnibus hearing that he spoke with the confidential informant for 15 to 25 minutes. He gave no further detail, however, about what their conversation involved, stating that to do so would reveal the informant's identity.

2. Thompson was a co-defendant in the omnibus hearing. She subsequently pled guilty and is not a party to this appeal.

identified Carter as the individual he had seen putting the white mixture on the table and dividing it into piles, Johns as the man who wore slippers and placed the piles into baggies, and Thompson as the individual who cut the ends off the baggies and placed the baggies in piles. Police ultimately learned that Carter and Johns were residents of Chicago, Illinois, and that Thompson was the sole lessee of apartment 103. Subsequent to his arrest, Carter made a statement to the police in which he admitted ownership of a duffel bag found inside the Cadillac. A search of the duffel bag uncovered a digital gram scale containing traces and residue of cocaine. Johns made a statement to the police admitting he had accepted a proposal to transport cocaine from Illinois to Minnesota for money, and that he, Carter and Thompson had packaged the cocaine at Thompson's apartment. He also admitted that there were approximately two ounces of crack cocaine and a handgun in the vehicle.

Carter, Johns and Thompson made motions through joint counsel to suppress their statements and all evidence seized from both the apartment and the Cadillac. They argued, among other things, that Thielen's initial observation through the window of Thompson's apartment was an unreasonable search under the Fourth Amendment and that all evidence obtained as a result of those observations should be excluded as fruit of the poisonous tree. After a two-day omnibus hearing, the district court denied the motions to suppress of Carter and Johns. The court held that the two defendants did not have standing to challenge Thielen's observations through Thompson's window because both defendants failed to present evidence that their expectations of privacy in the apartment were based upon "understandings that are recognized and permitted by society." See *Rakas v. Illinois*, 439 U.S. 128, 143–44 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387 (1978); *see also Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). In particular, the court noted that the only evidence presented by the defense showed that the two defendants were out-of-state residents who had been at the apartment for a period of time on May 15, 1994. The district court also concluded that Thielen's observa-tion was not a search within the meaning of the Fourth Amendment because the officer made his observation from an area in which the defendants had no reasonable expectation of privacy.

Following the district court's denial of their motions to suppress, Carter and Johns proceeded with separate counsel. The district court tried Carter on stipulated facts and found him guilty of conspiracy to commit a controlled-substance crime in the first degree and aiding and abetting a controlled-substance crime in the first degree. Minn. Stat. § 152.021, subd. 1(1), subd. 3(a) (1996); Minn.Stat. § 609.05 (1996). The district court denied Carter's request for a downward departure and sentenced him to 86 months. Carter appealed his conviction, challenging the legality of Thielen's observations through Thompson's apartment window. The court of appeals held that Carter did not have standing to object to Thielen's actions because Carter's claim that he was predominantly a social guest was "inconsistent with the only evidence concerning his stay in the apartment, which indicates that he used it for a business purpose—to package drugs." *State v. Carter*, 545 N.W.2d 695, 698 (Minn.App.1996).

We therefore begin our analysis by addressing the question of standing, and only if we determine that Carter had standing to bring a motion to suppress evidence recovered as a result of Thielen's observation of the apartment, will we address the legality of Thielen's actions—whether his observation qualified as a search, and if it did, whether it was reasonable.

## I. Standing

Because the facts of this case are not in dispute, we will review de novo the district court's denial of Carter's motion to suppress. *State v. Othoudt*, 482 N.W.2d 218, 221 (Minn.1992). Before a criminal defendant can bring a motion to suppress evidence on the basis that it was obtained in violation of the Fourth Amendment, the defendant must show that he or she is a proper party to assert the claim of illegality and to seek the remedy of exclusion. To establish such a showing, a party must demonstrate two

things: First, that he or she has an adversary interest in the outcome. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 702, 7 L.Ed.2d 663 (1962). And second, that the adverse interest is based upon an alleged violation of the rights of the individual, rather than the violation of the rights of some third party. *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960)(overruled on other grounds).[3] As far as the first factor is concerned, a criminal defendant against whom the allegedly illegally obtained evidence is being offered surely qualifies as one who has an adversary interest. *See* 5 Wayne R. LaFave, *Search and Seizure* § 11.3, at 117 (3d ed.1996) (hereinafter LaFave). Consequently we hold that Carter had an adversarial interest in the outcome. The analysis of the second factor is not so easily decided, however. As the United States Supreme Court has told us, the question turns on a "determination of whether the disputed search * * * has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Rakas,* 439 U.S. at 140, 99 S.Ct. at 429. Such an interest exists when "the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Id.* at 143, 99 S.Ct. at 430. The question before us, therefore, is whether Carter had a legitimate expectation of privacy in Thompson's apartment.[4]

■ A defendant has a legitimate expectation of privacy when his or her subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable.'" *Id.* at 143–44 n. 12, 99 S.Ct. at 430 n. 12 (quoting *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)(Harlan, J., concurring)). In other words, a criminal defendant must make two showings to establish that he or she based the motion to suppress upon an alleged violation of his or her individual Fourth Amendment right. First, he or she must show a subjective expectation of privacy, and second, he or she must show that this expectation was reasonable in light of "longstanding social customs that serve functions recognized as valuable by society." *Olson,* 495 U.S. at 98, 110 S.Ct. at 1689.

■ In the case at bar, it is clear that Carter had a subjective expectation of privacy. He was inside the apartment of an acquaintance with the doors shut and the blinds drawn. The more difficult question is whether Carter's expectation was legitimate, that is, whether the expectation was the type that society is prepared to recognize as reasonable. Both the district court and court of appeals concluded that Carter failed to establish that his subjective expectation was legitimate. The district court based its conclusion on the fact that Carter offered no evidence that his status in relation to the apartment was similar to the status of the defendant in *Olson,* or that his status was such that it provided a legitimate expectation of privacy in the apartment. Likewise, the court of appeals based its conclusion on the fact that Carter's claim that he was a social guest was inconsistent with the "only evidence concerning his stay in the apartment, which indicates that he used it for a business purpose * * * ." *Carter,* 545 N.W.2d at 698. In both cases, the courts focused on the facts of *Olson,* a case in which there was no dispute that the criminal defendant was an overnight guest of the person who had the possessory interest of the searched residence.[5] By com-

---

3. *Jones* was being interpreted as establishing "automatic standing" to challenge the legality of a search for any persons charged with crimes of possession. *United States v. Salvucci,* 448 U.S. 83, 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980). *Salvucci* overruled this holding to establish that the defendant must show a possessory interest in the items seized *and* an expectation of privacy in the areas searched to establish that he/she had standing to challenge the legality of a search. *Id.*

4. The district court found that Carter had no expectation of the privacy in the area from which Thielen observed the illegal activity. As we will discuss *infra* in Section II, however, the proper question is whether Carter had an expectation of privacy in the area into which Thielen was looking—namely the inside of the apartment.

5. The issue of whether a defendant has standing to assert a violation of the Fourth Amendment has a long and muddled history. Throughout the first half of this century, courts decided standing by using common-law concepts of private property. Courts generally found those individuals who had an ownership interest, a leasehold, or "dominion and control" over the searched property to have standing to contest a search of the

parison, it is undisputed that Carter failed to produce any evidence that he was a "guest" of Thompson's, let alone an "overnight guest." But a closer reading of *Olson* reveals that the Supreme Court does not require a person to establish his or her status as either a guest or overnight guest before that person can prove a legitimate expectation of privacy in a location that is searched. Instead, the person must establish only that under the totality of the circumstances, the person's subjective expectation was the type of expectation that "society is prepared to recognize as 'reasonable.' "

█ Admittedly, such a test·is a difficult one to define, let alone apply. But the Supreme Court's own words offer guidance. "To hold that an overnight guest has a legitimate expectation of privacy in his host's home merely recognizes the everyday expectations that we all share. Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." *Olson*, 495 U.S. at 98, 110 S.Ct. at 1689. In other words, the Court in *Olson* did not recognize the expectation of privacy as legitimate merely because the criminal defendant was a *guest. See* 5 LaFave, *supra*, § 11.3(b), at 137 (stating that the Court's decision lends "considerable support to the claim that shorter term guests

also have standing").[6] Rather, it recognized the defendant's expectation of privacy as legitimate because the criminal defendant's status as a guest was the type of longstanding social custom that serves functions recognized as valuable by society. As the Court went on to state: "The point is that hosts will more likely than not respect the privacy interest of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household." *Olson*, 495 U.S. at 99, 110 S.Ct. at 1689. Consequently, if Carter had established that his status is the type that serves functions recognized as valuable by society, his expectation of privacy would have been legitimate.

█ The stipulated facts show that the apartment's leaseholder allowed Carter and Johns into her apartment for the purpose of packaging cocaine in exchange for one-eighth ounce of cocaine; that Thielen observed all three persons inside the apartment as they collaborated to divide and package the cocaine; that Carter and Johns remained inside the apartment for at least 2 1/2 hours, and that Johns was wearing bedroom slippers while inside the apartment.[7] Although

---

property. *Courts, meanwhile, found that mere "guests" and "invitees" did not have such standing. Jones*, 362 U.S. at 265–66, 80 S.Ct. at 733 *(citations omitted). The Supreme Court rejected this property-based approach in favor of a broad rule that allowed "anyone legitimately on the premises where a search occurs" to challenge its legality by way of a motion to suppress. Id.* at 267, 80 S.Ct. at 734. *The Court later retreated from the "legitimately on the premises" test. Rakas*, 439 U.S. at 128, 99 S.Ct. at 423. *The Court in Rakas held that the mere fact that an individual was "legitimately on the premises" was insufficient to give that person standing to contest a search of another's dwelling place. Id.* at 143, 99 S.Ct. at 430.

**6.** Many other courts have concluded that *Olson* does not require a criminal defendant to prove his or her status as a guest to establish a legitimate expectation of privacy. *See, e.g., Hill v. United States*, 664 A.2d 347, 352 (D.C.1995) *("To be sure, being an overnight guest is not the sole means by which one may claim an expectation of privacy in another's home.") (citations omitted); Davis v. State*, 582 So.2d 61, 61 (Fla.Dist.Ct.App. 1991) *("Olson does not necessarily deny standing to one whose status in a residence is less than*

that of an overnight guest."); *State v. Wright*, 119 N.M. 559, 893 P.2d 455, 459 (N.M.Ct.App.1995) *("[W]e do not read Olson to make an individual's overnight status as a houseguest a precondition to the right to assert an invasion of a reasonable expectation of privacy under the Fourth Amendment to the United States Constitution."); State v. Ackerman*, 499 N.W.2d 882, 884 (N.D.1993) *("[M]uch of the reasoning underlying the Supreme Court's finding of standing on the part of an overnight guest would support standing on the part of other guests, as well * * * .").*

**7.** Carter offered evidence of Johns' slippers to show that the two were so comfortable inside the apartment that they must have been guests. While recognizing the relevance of such a fact, we refuse to place a great deal of constitutional significance on a person's footwear. It is interesting to note, however, that another court recently found a lack of standing in part on the fact that one of the defendants "was feigning sleep while fully dressed and wearing *shoes." Hill v. United States*, 664 A.2d 347, 350 (D.C.1995) (emphasis added).

we recognize that these facts probably fail to establish Carter as a "guest" of the apartment's leaseholder, we conclude that they were sufficient to prove that Carter was the type of person who possessed a legitimate expectation of privacy in the apartment. After all, Carter had the leaseholder's permission to be inside the apartment.[8] He remained inside the apartment for at least 2 1/2 hours, during which time he worked in concert with the leaseholder on a common task.[9] Whether these facts establish Carter as a visitor, invitee or business partner does not matter. As the Court has carefully noted, arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like do not control. *Jones*, 362 U.S. at 266, 80 S.Ct. at 734. What does control, however, is the nature of the relationship between the property possessor and the person alleging the privacy interest in the property. If the relationship is the type that society recognizes as valuable, then we will find standing. If it is not, then we will not. Although society does not recognize as valuable the task of bagging cocaine, we conclude that society does recognize as valuable the right of property owners or leaseholders to invite persons into the privacy of their homes to conduct a common task, be it legal or illegal activity. We, therefore, hold that Carter had standing to bring his motion to suppress the evidence gathered as a result of Thielen's observations.

## II. The Search

Having determined that Carter had standing to assert a violation of the

Fourth Amendment, we now turn to the question of whether Thielen's observation constituted a search. A search occurs whenever government agents intrude upon an area where a person has a reasonable expectation of privacy. *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986) (citing *Katz*, 389 U.S. at 360, 88 S.Ct. at 516 (Harlan, J. concurring)). The state argues Thielen's observations did not rise to the level of a search because he was not inside the leaseholder's "curtilage" when he made his observation. As support for its argument, the state offers *State v. Krech*, 403 N.W.2d 634 (Minn.1987) for the proposition that the common grounds of multi-unit apartment complexes are not entitled to Fourth Amendment protection. In *Krech*, we stated:

> "it is a fair generalization that the lands adjoining a multiple-occupancy residence are less likely to receive Fourth Amendment protection than the yard of a single family residence" because "the privacy expectation as to such an area is often diminished because it is not subject to the exclusive control of one tenant and is utilized by tenants generally and the numerous visitors attracted to a multiple occupancy building."

403 N.W.2d at 637 (quoting 1 Wayne R. LaFave, *Search and Seizure* § 2.3(f), at 414 (2d ed.1987)). The state's argument misses the point of *Krech*, however.

In developing the concept of "curtilage," the Supreme Court actually extended

8. Although the fact that a person is legitimately on the premises is not by itself sufficient to establish standing, *Rakas*, 439 U.S. at 142, 99 S.Ct. at 429, it is important to note that a person who is not legitimately on the premises cannot have standing, 5 LaFave, *supra*, § 11.3(b), at 143. Courts also have concluded that "a showing that a person authorized to do so gave permission for the defendant to be present on that particular occasion" was sufficient to establish the fact that the defendant was legitimately on the premises. *Id.* at 144, 99 S.Ct. at 431.

9. Many courts have denied standing where it is apparent that the party alleging the illegal search was on the property very briefly or had only a minimal connection to the property or the host. *See, e.g., United States v. McNeal*, 955 F.2d 1067 (6th Cir.1992) (finding no legitimate expectation of privacy where defendant stated he had

stopped by the host's home only to use the telephone); *Prophet v. United States*, 602 A.2d 1087 (D.C.1992) (finding no standing where defendant had been at his friend's house for only 3 or 4 minutes prior to the police's entry); *Davis v. State*, 582 So.2d 61 (Fla.Dist.Ct.App.1991) (finding no legitimate expectation of privacy where defendant had been given permission to enter house by occupant's boyfriend, but occupant never had seen the defendant before and was shocked to find him in her apartment); *State v. Wise*, 879 S.W.2d 494 (Mo.1994) (finding no legitimate expectation of privacy where defendant merely had entered occupant's apartment to make a phone call); *State v. Baltimore*, 242 Neb. 562, 495 N.W.2d 921 (1993) (finding no standing where defendant had entered neighbor's house only to use the bathroom).

Fourth Amendment protection to those areas so intimately tied to the home itself that an individual reasonably could have expected persons to treat those areas as part of the home. *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). The curtilage cases, therefore, necessarily involve factual scenarios in which police search areas spatially removed from the home itself. *See, e.g., Dunn*, 480 U.S. at 297, 107 S.Ct. at 1137 (agents entered area surrounding barns, 50 feet from house); *Krech*, 403 N.W.2d at 637–38 (police entered yard of duplex where garbage cans were kept). The key question in a curtilage case is not where the police officer was standing when he made his observation, although police officers must establish that they had a legal right to be where they were at the time of the observation, rather it is the area that was observed. Although it is plausible that Thielen's presence just outside the apartment window was legitimate,[10] the state cannot rely on Thielen's position alone to justify his subsequent observation into the apartment. The fact that a police officer was situated outside a *residence's curtilage does not necessarily* eliminate the occupant's expectation of privacy within the interior of the dwelling. 1 LaFave, *supra*, § 2.3(d), at 495–96.

> The fundamental question under *Katz* is whether the looking intruded upon the justified expectation of privacy of the occupant. This, in turn, ordinarily requires consideration of two factors: (1) the location of the officer at the time of the viewing; and (2) the precise manner in which the view was achieved.

*Id.* at 497.

■■■ This, of course, does not mean that all instances in which a police officer looks into a house or apartment will be a search under the Fourth Amendment. "What a person knowingly exposes to the public, even in his own home or office, is not subject to Fourth Amendment protection." *Katz*, 389 U.S. at 351, 88 S.Ct. at 511. We, therefore, have held that police did not violate a homeowner's expectation of privacy by walking onto the homeowner's driveway and observing stolen property that was in plain sight from the driveway. *State v. Crea*, 305 Minn. 342, 346, 233 N.W.2d 736, 739 (1975). Other courts similarly have found no Fourth Amendment protection for activities that are easily observable by the general public.[11]

■■■ People who close their doors and window blinds, however, do not knowingly expose their activities to the public. Consequently, we conclude that Carter, Johns, and Thompson took sufficient precautions to keep their activities private. It was only after Thielen left the sidewalk, walked across the grass, climbed over some bushes, crouched down and placed his face 12 to 18 inches from the window that their activities became observable. As one noted commentator has stated:

> [W]hen police surveillance takes place at a position which cannot be called a "public vantage point," i.e., when the police— though not trespassing on the defendant's curtilage—resort to the extraordinary step of positioning themselves where neither neighbors nor the general public would be expected to be, the observation or overhearing of what is occurring within a dwelling constitutes a Fourth Amendment search. This is really what *Katz* is all about.

1 LaFave, *supra*, § 2.3(d), at 482. Several courts have agreed that it is a search whenever police take extraordinary measures to enable themselves to view the inside of a

---

**10.** It is at least arguable that Thielen's position just outside the apartment window was on a common area and not the curtilage to Thompson's apartment.

**11.** *See United States v. Acevedo*, 627 F.2d 68 (7th Cir.1980) (finding no search where police officer looked into an apartment window from a public gangway); *People v. Berutko*, 71 Cal.2d 84, 77 Cal.Rptr. 217, 453 P.2d 721 (1969) (finding no search where officers on defendant's front porch were able to see illegal activity through an opening in window covering); *People v. Wright*, 41 Ill.2d 170, 242 N.E.2d 180 (1968) (finding no search where officer standing on transit authority right-of-way was able to see through a crack in the window curtain into defendant's apartment); *State v. Taylor*, 61 Ohio App.2d 209, 401 N.E.2d 459 (1978) (finding no search where officers looked into unshaded apartment window from public sidewalk).

private structure.[12] The question before us, therefore, is whether Thielen took extraordinary measures to enable him to view the inside of the apartment. Although it is a close question whether Thielen's location at the time of his observation was legitimate, the totality of his acts makes such a determination unnecessary. For even if we concluded that the area just outside the apartment window was a common area, the fact that Thielen left the sidewalk, walked across the grass, climbed over the bushes, placed his face within 12 to 18 inches of the window and peered through a small gap between the blinds makes it clear that he took extraordinary measures to enable himself to view the inside of a private dwelling. If we conclude that his actions constituted anything other than a search, it is difficult to imagine when we would be able to say that any activity short of an actual physical intrusion of a dwelling would violate a person's expectation of privacy. We therefore hold that Thielen's conduct constituted a search under the Fourth Amendment.[13]

**12.** *See, e.g., Lorenzana v. Superior Court of Los Angeles County*, 9 Cal.3d 626, 108 Cal.Rptr. 585, 587, 511 P.2d 33, 35 (1973) (finding a search where police leave the driveway and peek through a two-inch gap in a drawn window shade); *Olivera v. State*, 315 So.2d 487, 491 (Fla.Dist.Ct.App.1975) (finding that police violated defendant's reasonable expectation of privacy by leaving the sidewalk and walking across grass outside apartment building to look into defendant's apartment window); *State v. Harris*, 919 S.W.2d 619, 623–24 (Tenn.Crim.App.1995) (stating that, while officers are free to position themselves on a public sidewalk, once they walk around the building or attempt to gaze into a window, their activity becomes a search); *State v. Bowling*, 867 S.W.2d 338, 341–42 (Tenn.Crim. App.1993) (finding a search where an officer in a driveway got down on his hands and knees with his head almost touching the ground to look into a private garage).

**13.** The state asserts that Thielen's actions were analogous to those we found to be constitutional in *State v. Buchwald*, 293 Minn. 74, 196 N.W.2d 445 (1972). In *Buchwald*, an officer investigating a report of a marijuana party taking place in several hotel rooms knocked on the defendant's door and, after the defendant opened the door in response, the officer observed several marijuana cigarettes in plain view inside the room. *Id.* at 447. We held that the police officer's actions did not constitute a search. *Id.* at 448. We based our conclusion, however, on the fact the defen-

## III. Reasonableness of the Search

The Fourth Amendment protects persons from, among other things, unreasonable searches. U.S. const., amend. IV. In order for a search to be reasonable, the police must have both probable cause and a search warrant. *Id.; In re Welfare of G. (NMN) M.*, 560 N.W.2d 687, 692 (Minn.1997). In the case at bar, the state conceded that, prior to his observations through Thompson's window, Thielen did not have probable cause to obtain a search warrant. The facts also show that Thielen did not have a search warrant at the time of the observation. Despite these facts, the state now asserts that Thielen's search was reasonable because he had a reasonable basis for believing the occupants of Thompson's apartment were engaged in drug activity and because his search was minimally intrusive.[14] As the Supreme Court made clear in *Katz*, however, conduct that would constitute an illegal search does not become something less merely because the police had reasonable suspicion and embarked on a search of limited intrusiveness.[15]

dant had consented to the officer's "entry" by opening the door:

> The observation into the defendant's open room by the police officer positioned outside the room was not an invasion of defendant's privacy, for the defendant himself opened the door voluntarily. He was not compelled to open it and the voluntariness of his doing so was not the less merely because the unknown knocker was a police officer.

*Id.* at 448. In this case it cannot be said that Carter in any way consented to Thielen's observations.

**14.** The state also asserts that Thielen's warrantless search was reasonable because there were exigent circumstances. As we have stated in the past, police can make warrantless arrests, entries and searches of dwellings when they can demonstrate the existence of probable cause and exigent circumstances. *State v. Lohnes*, 344 N.W.2d 605, 610–11 (Minn.1984). Because the state admits that Thielen lacked probable cause, however, any reliance on this exception is misplaced.

**15.** The State argues, and the court of appeals agreed, that Officer Thielen's actions were reasonable under *State v. Crea*, 305 Minn. 342, 233 N.W.2d 736 (1975). In *Crea*, after seeing a stolen snowmobile trailer in plain view outside the appellant's house, the police shined a flashlight into the garage and the basement window of the house and saw two stolen snowmobiles. *Id.* at

As such, we once again reject the notion that a little bit of information justifies a little bit of a search.

Reversed.

STRINGER, Justice, dissenting.

While I agree with the court's conclusion that the police officer's actions in this case constituted an illegal search under the Fourth Amendment, I believe that Carter failed to show that he had a legitimate expectation of privacy in Thompson's apartment and I therefore dissent.

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 131 n. 1, 99 S.Ct. 421, 424 n. 1, 58 L.Ed.2d 387 (citations omitted). A challenge to a search must establish *ab initio* a legitimate expectation of privacy in the invaded place—that is, an expectation of privacy that "society is prepared to recognize as 'reasonable.'" *Id.* at 143–44, n. 12, 99 S.Ct. at 430, n. 12 (quoting *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (Harlan, J., concurring)).

The United States Supreme Court has acknowledged that the mere fact that a person is legitimately on the premises of another is insufficient to give that person standing to contest a search of the other person's premises. *Rakas*, 439 U.S. at 143, 99 S.Ct. at 430. Courts have found a legitimate expectation of privacy to exist where the defendant demonstrated a meaningful connection to the property or the host—for example, where the defendant was related to the host or had been given a key to the premises. *See, e.g., United States v. Haydel*, 649 F.2d 1152 (1981) (holding that defendant had legitimate expectation of privacy in his parent's home to which he had a key and unencumbered access); *Rose v. United States*, 629 A.2d 526 (D.C.App.1993) (holding that defendant had standing to challenge search of close relative's house to which he had a key and was a regular visitor). But standing has been denied where the party alleging an illegal search established no more than that they were a transient visitor to the property of another—where, for example, the defendant was present on the property only to use the telephone or bathroom,[1] was merely a party guest,[2] or otherwise failed to establish a connection to the property beyond simply being present at the time of the search.[3] Further-

738. Without specifically invoking one of the exceptions to the warrant requirement recognized by the Supreme Court, we held that the officers had acted reasonably because: 1) after seeing the stolen snowmobile trailer in the driveway, they had "very strong" probable cause to believe the stolen snowmobiles were in the house; 2) "their intrusion, being visual and involving a basement window only, was minimal"; and 3) the late hour would have made obtaining a warrant difficult. *Id.* at 740. To the extent that *Crea* may be read as establishing that a warrantless search can be justified based on a general finding that it was "reasonable," it runs counter to the Supreme Court's holdings that the fact that an officer reasonably expected to find evidence and used the least intrusive means possible to achieve that end is insufficient to sustain a warrantless search. *See Katz*, 389 U.S. at 356, 88 S.Ct. at 514. Unlike here, the officers in *Crea* had "very strong" probable cause to suspect the stolen snowmobiles were inside the house. *Crea*, 233 N.W.2d at 740. It was not our intent in *Crea* to step back from the requirement of probable cause and exigent circumstances or to, in any other way, modify our analysis of warrantless searches under the Fourth Amendment.

1. *See, e.g., United States v. McNeal*, 955 F.2d 1067 (6th Cir.1992) (holding no legitimate expec-

tation of privacy where defendant stated that he had only stopped by the host's home to use the telephone); *State v. Wise*, 879 S.W.2d 494 (Mo. 1994) (holding no legitimate expectation of privacy where defendant had merely entered occupant's apartment to make a phone call); *State v. Baltimore*, 242 Neb. 562, 495 N.W.2d 921 (1993) (holding that defendant who had only entered neighbor's house to use the bathroom did not have a legitimate expectation of privacy, despite the fact that defendant was occasionally given a key to the house for purpose of using the garden hose).

2. *See, e.g., United States v. Maddox*, 944 F.2d 1223 (6th Cir.1991) (holding that defendant had no reasonable expectation of privacy where nothing in the record indicated that he was anything other than a transient party guest); *Lewis v. United States*, 594 A.2d 542 (D.C.App.1991) (holding that a mere party guest does not have a reasonable expectation of privacy in the host's home).

3. *See, e.g., State v. Conklin*, 249 Neb. 727, 545 N.W.2d 101 (1996) (holding that defendant did not have standing to challenge search that occurred while he was in neighbor's apartment

more, at least one court has recognized that a defendant present at the time of a narcotics search and a member of a criminal venture does not have a reasonable expectation of privacy sufficient to challenge the unannounced police entry of the apartment of another being used as a drug packaging operation. *See United States v. Lockett,* 919 F.2d 585 (9th Cir.1990).[4]

Here, Carter established nothing beyond the fact that he was present in Thompson's apartment for a period of 2 1/2 hours. He introduced no evidence that he had any prior relationship with Thompson, that he had ever been to her apartment before the night of his arrest, that he had personal effects in the apartment, that he had a key to the apartment, that he could invite or exclude others, or that he had any connection with the apartment other than his presence at the time of the search. The record is simply void as to any indicia that Carter was anything more than a brief, transient visitor. On these facts, it cannot be said that Carter met his burden of establishing a reasonable expectation of privacy in the apartment. I would therefore hold that Carter did not have standing to challenge the search of the apartment and affirm the decision of the court of appeals.

KEITH, Chief Justice (dissenting).

I join in the dissent of Justice Stringer.

BLATZ, Justice (dissenting).

I join in the dissent of Justice Stringer.

where he was only an occasional guest at the apartment, possessed no interest in the property and had no freedom to exclude anyone from the premises); *Hill v. United States,* 664 A.2d 347 (D.C.App.1995) (holding that, where there was no evidence that the defendants had a key to their friend's apartment, that they could admit or exclude others from the apartment, or establishing how much time they had spent in the apartment, they had failed to demonstrate a legitimate expectation of privacy); *Prophet v. United States,* 602 A.2d 1087 (D.C.App.1992) (holding that defendant who had only been at his friend's house a few minutes before the police arrived did not have standing to challenge the entry); *People v. Rodriguez,* 69 N.Y.2d 159, 513 N.Y.S.2d 75, 505 N.E.2d 586 (1987) (holding that defendant found sleeping in the apartment of another had no standing where he was "a transient who had no indicia of legitimate or recognizable connection to the apartment where he was arrested or any

relevant thing in that apartment"); *Commonwealth v. Tann,* 500 Pa. 593, 459 A.2d 322 (1983) (holding no legitimate expectation of privacy in apartment where defendant was only occasional visitor to apartment, had no possessory or proprietary interest in it, and had been present for only 10–15 minutes prior to search).

4. *Lockett* involved an allegation that the police, in entering an apartment that housed a drug packaging operation, did not comply with the federal "knock-and-announce" statute, 18 U.S.C. § 3109 (1988). However, the standard applied in determining whether the defendant had standing to challenge the entry was the same as that used to determine standing to challenge a search: whether the defendant had "a legitimate expectation of privacy in the property used by the joint venture." 919 F.2d at 588.