STATE OF NEBRASKA, APPELLEE, V. STEAVE BALTIMORE, APPELLANT.

495 N.W.2d 921

Filed February 26, 1993.   No. S-91-124.

Thomas M. Kenney, Douglas County Public Defender, and Brian S. Munnelly for appellant.

Don Stenberg, Attorney General, and James A. Elworth for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

As a result of a jury trial in the district court for Douglas County, Steave Baltimore was convicted on separate counts of

possessing a controlled substance, Ritalin (methylphenidate hydrochloride) and Talwin (pentazocine), with the intent to distribute, deliver, or dispense the substances, contrary to Neb. Rev. Stat. § 28-416(1)(a) (Reissue 1989) of the Nebraska Criminal Code. As the sole assignment of error in his appeal, Baltimore claims that the Ritalin and Talwin, seized by police and introduced as physical evidence over Baltimore's objection at trial, were unconstitutionally obtained by an unreasonable search and seizure.

## SURVEILLANCE AND ARREST OF BALTIMORE
*The Surveillance.*

The narcotics unit of the Omaha Police Division received information that an illegal narcotics operation was being conducted in Omaha at a vacant house described as 2509 Grant Street. Sometime on June 13, 1990, near the vacant house, a police informant had purchased some Ritalin and Talwin from Baltimore and supplied the narcotics unit with a detailed description of Baltimore, including his physical characteristics and the clothing worn by him. Arthur Cowans resided in a house at 2218 North 25th Avenue, catercorner and southeast of the vacant house. Consequently, Baltimore and Cowans were prime suspects in the narcotics traffic area. East of and adjacent to Cowans' residence was a dwelling at 2220 North 25th Avenue, where James Holly lived. Baltimore lived several blocks from the Holly house and Cowans' residence. Between Cowans' residence and the Holly house was a small vegetable garden where Baltimore and his cogardner-friend, Holly, raised corn, sweet potatoes, and cabbage. Since there was no water supply for the garden, Baltimore prevailed on Cowans for use of a garden hose kept inside Cowans' house and water from the Cowans residence. Cowans "sometimes" gave Baltimore a key to Cowans' house so that Baltimore "borrowed the hose from Cowans" and "hooked it up and watered" the Baltimore-Holly garden.

About 10:30 p.m. on June 13, 1990, officers of the narcotics unit took up surveillance of the vacant house. Officers involved in the surveillance were, among others, Bruce M. Ferrell, Mark T. Langan, and Mark Sundermeier. When the officers

commenced their surveillance, an individual, later identified as Cowans, was seated in a lawn chair beneath the carport attached to the vacant house. Police observed that another man, fitting the previous description of Baltimore according to the informant, walked toward the rear of the vacant house, bent down, and picked up something from the ground. That man then proceeded to enter the Cowans residence through a rear door on the west side of the house. At that time, the officers decided to approach Cowans and Baltimore, who was still in Cowans' house.

*Police Entry into Cowans' Residence.*

Wearing a jacket with "Omaha Police" printed in fluorescent letters and with his badge displayed from a chain around his neck, Officer Ferrell went to the rear door of Cowans' house and knocked. Baltimore partially opened the door and, when he saw Ferrell, who identified himself as a police officer, tried to slam the door with his left hand, while simultaneously using his right hand to throw an object behind him. Ferrell put his foot in the open doorway and heard something hit the floor inside the house. Believing that Baltimore was about to conceal or destroy evidence, Ferrell threw open the door and entered the house's kitchen area. Ferrell then arrested Baltimore and placed handcuffs on him near the refrigerator. Another officer entered and took charge of Baltimore, while Ferrell went to talk with Officer Sundermeier, who had taken Cowans into custody. Ferrell walked to the carport at the vacant house, where, in the meantime, officers had found a pharmaceutical container labeled "Talwin" and $590 in cash on Cowans. Ferrell asked Cowans' permission to search the Cowans residence for drugs and weapons. Officer Langan, also present when Ferrell was talking with Cowans, told Cowans that the police wanted to search his house for Ritalin and Talwin. Cowans verified that Baltimore did not live in Cowans' residence and granted permission to the police for a search of the Cowans house.

Ferrell and Langan went back into the kitchen of Cowans' house, where Baltimore was still handcuffed and in the custody of an officer. In a trash box beneath a table near the

refrigerator, Ferrell discovered a brown "pill bottle" containing tablets, later analyzed and identified as 67 Talwin tablets and 26 Ritalin tablets. Several other pill bottles were retrieved from the trash box. On searching Baltimore's person, officers found a set of keys that fit the lock and dead bolt in the rear door of the Cowans house. Police transported Baltimore to their headquarters, and he was later charged regarding the Ritalin and Talwin taken from Cowans' residence.

### BALTIMORE'S SUPPRESSION MOTION AND TRIAL

Before trial, Baltimore filed his motion to suppress the State's use of the Ritalin and Talwin discovered at Cowans' house as evidence against Baltimore, and alleged that the police unconstitutionally obtained the substances by an unreasonable search and seizure, in violation of U.S. Const. amend. IV and Neb. Const. art. I, § 7. After the court denied Baltimore's suppression motion, Baltimore went to trial, during which he renewed his constitutional objection to the State's introduction of the Ritalin and Talwin as evidence.

Ferrell testified concerning the circumstances and events surrounding his participation in the surveillance previously described and his entry into Cowans' house. Langan, as a specially trained narcotics investigator, testified about Ritalin, a mild central nervous system stimulant, and Talwin, a potent analgesic with sedative properties and effects similar to codeine. According to Langan, individuals illegally purchase a "set" of Talwin and Ritalin, that is, one Talwin tablet and two Ritalin tablets per set, which sell for $21. The tablets are then pulverized and, being readily soluble, are dissolved in water to achieve a liquid for an intravenous injection that produces a "heroin-type high."

Baltimore testified on his own behalf. On the evening of the police surveillance, Baltimore went to Holly's house to deliver some seeds for the garden. Since Holly was not home, Baltimore visited briefly with Cowans at the carport at the vacant house. Baltimore testified: "I needed to use the bathroom, I couldn't wait until I got home." Therefore, he asked for the key to Cowans' house and use of its bathroom. Baltimore testified that, although Cowans had previously given

him a key which enabled Baltimore to get the hose and water the garden frequently, even as recently as the morning preceding the evening surveillance by the police, Baltimore did not intend to water his garden that evening. Using the key received from Cowans at the carport that night, Baltimore unlocked the back door of the Cowans residence and entered to use the bathroom. After using the toilet, and while he was opening the rear door of Cowans' house, Baltimore encountered Ferrell wearing his police garb and badge. Ferrell said, "Get back in there," and Baltimore retreated to the refrigerator in the kitchen. Ferrell handcuffed Baltimore and later searched the kitchen, where Ferrell found the pill bottle containing the Ritalin and Talwin tablets, which, over Baltimore's renewed constitutional objection, were received as evidence in Baltimore's trial.

The jury found Baltimore guilty as charged, and he now appeals and claims that the evidence of the Ritalin and Talwin were constitutionally inadmissible and, therefore, should have been excluded from evidence against him. Baltimore argues that the police lacked probable cause for the search that produced the physical evidence, i.e., the Ritalin and Talwin. In response, the State contends that Baltimore lacks standing to raise the issue concerning constitutional validity of the search and seizure. To support his position that he has standing, Baltimore relies on the fact that Cowans gave him a key and permission to enter the Cowans residence and get the hose to water the garden.

## STANDING

In *Payton v. New York*, 445 U.S. 573, 576, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980), the U.S. Supreme Court held that "the Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment . . . prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." Evidence seized in a defendant's home as the result of a nonconsensual entry by police without a warrant is a product of an unreasonable search and seizure and may be suppressed as constitutionally inadmissible evidence. However, before one may challenge a search without a warrant, one must

have standing in a legal controversy. *State v. $15,518*, 239 Neb. 100, 474 N.W.2d 659 (1991).

"Standing" means that a person has a sufficient legally protectable interest which may be affected in a justiciable controversy, entitling that person to judicial resolution of the controversy. See, *State v. $15,518, supra*; *Rexroad, Inc. v. S.I.D. No. 66*, 222 Neb. 618, 386 N.W.2d 433 (1986); *Nebraska Sch. Dist. No. 148 v. Lincoln Airport Auth.*, 220 Neb. 504, 371 N.W.2d 258 (1985); *Hall v. Cox Cable of Omaha, Inc.*, 212 Neb. 887, 327 N.W.2d 595 (1982). See, also, *Sierra Club v. Morton*, 405 U.S. 727, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972); *State ex rel. Cartwright v. Oklahoma Tax Comm'n*, 653 P.2d 1230 (Okla. 1982).

"While not a constitutional prerequisite for jurisdiction of courts of the State of Nebraska . . . existence of an actual case or controversy, nevertheless, is necessary for the exercise of judicial power in Nebraska." *Mullendore v. Nuernberger*, 230 Neb. 921, 925, 434 N.W.2d 511, 515 (1989). Accord *In re Estate of West*, 226 Neb. 813, 415 N.W.2d 769 (1987). Thus, a court decides real controversies and determines rights actually controverted, and does not address or dispose of abstract questions or issues that might arise in a hypothetical or fictitious situation or setting. See, *Mullendore v. Nuernberger, supra*; *In re Estate of West, supra*.

Therefore, standing relates to a court's power, that is, jurisdiction, to address issues presented and serves to identify those disputes which are appropriately resolved though the judicial process. See *Whitmore v. Arkansas*, 495 U.S. 149, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990). As pointed out in 13 Charles A. Wright et al., Federal Practice and Procedure: Standing § 3531 at 338-39 (2d ed. 1984), under the doctrine of standing, a court may refuse to determine merits of a legal claim because "the litigant advancing it is not properly situated to be entitled to its judicial determination. The focus is on the party, not the claim itself."

Standing relates to jurisdiction and prudential considerations regarding exercise of jurisdiction. See *Warth v. Seldin*, 422 U.S. 490, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975). As an aspect of jurisdiction and justiciability, standing requires

that a litigant have such a personal stake in the outcome of a controversy as to warrant invocation of a court's jurisdiction and justify exercise of the court's remedial powers on the litigant's behalf. See *id*. Thus, generally, a litigant must assert the litigant's own legal rights and interests, and cannot rest a claim on the legal rights or interests of third parties. See *id*. See, also, *Mullendore v. Nuernberger, supra*.

In *Whitmore v. Arkansas, supra*, the U.S. Supreme Court identified several basic requirements which must exist before a litigant has standing:

> [A] litigant first must clearly demonstrate that he has suffered an "injury in fact." That injury, we have emphasized repeatedly, must be concrete in both a qualitative and temporal sense. The complainant must allege an injury to himself that is "distinct and palpable," [citation omitted], as opposed to merely "[a]bstract," [citation omitted], and the alleged harm must be actual or imminent, not "conjectural" or "hypothetical." [Citation omitted.] Further, the litigant must satisfy the "causation" and "redressability" prongs of the Art. III minima by showing that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." [Citations omitted.] The litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements. A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing.

495 U.S. at 155-56.

Because the requirement of standing is fundamental to a court's exercising jurisdiction, a litigant or a court before which a case is pending can raise the question of standing at any time during the proceeding. See *State v. $15,518, supra*. "When a trial court lacks the power, that is, jurisdiction, to adjudicate the merits of a claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the trial court." *State v. Miller*, 240 Neb. 297, 300, 481 N.W.2d 580, 582 (1992). Accord, *Andrews v. City of Lincoln*, 224 Neb. 748, 401 N.W.2d 467 (1987); *In re Interest of L.D. et al.*, 224 Neb. 249, 398 N.W.2d 91 (1986). "Litigants

cannot confer subject matter jurisdiction on a judicial tribunal by either acquiescence or consent." *Coffelt v. City of Omaha*, 223 Neb. 108, 110, 388 N.W.2d 467, 469 (1986). Accord, *Marshall v. Marshall*, 240 Neb. 322, 482 N.W.2d 1 (1992); *State v. Miller, supra*; *Andrews v. City of Lincoln, supra*. Therefore, although the State did not raise the jurisdictional issue of standing until this appeal, we must determine whether Baltimore has standing to challenge the police search of Cowans' home without a warrant.

## EXPECTATION OF PRIVACY

The U.S. Supreme Court, in *Katz v. United States*, 389 U.S. 347, 351-52, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), wrote that

the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations omitted.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

In his concurrence in *Katz*, Justice Harlan established the two-part test used to determine whether a litigant has an "expectation of privacy" protected by the Fourth Amendment, that is, a litigant must show (1) an actual, although subjective, expectation of privacy and (2) a privacy expectation "that society is prepared to recognize as 'reasonable'." 389 U.S. at 361. In practice, however, courts frequently do not distinguish between the two parts of Justice Harlan's *Katz* test. See 1 Wayne R. LaFave, Search and Seizure § 2.1(c) (2d ed. 1987).

A person's expectation of privacy may be based on the "right to be let alone by other people," 389 U.S. at 350, the right to withhold property from public scrutiny, see *Fed. Trade Comm. v. Amer. Tobacco Co.*, 264 U.S. 298, 44 S. Ct. 336, 68 L. Ed. 696 (1924), or the person's belief that he or she is secure from intrusion by others.

The U.S. Supreme Court stated in *Rakas v. Illinois*, 439 U.S. 128, 140-43, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978):

[T]he question is whether the challenged search and seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence

obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect. . . .

. . . .

. . . [A] person can have a legally sufficient interest in a place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place. [Citation omitted.] [A]rcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control.

In *Rakas*, the Court concluded: "[T]he Court in *Katz* held that capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." 439 U.S. at 143.

"[A] person may have a sufficient interest in a place other than his home to enable [the person] to be free in that place from unreasonable searches and seizures." *Minnesota v. Olson*, 495 U.S. 91, 98, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990). Thus, when a guest is permitted into another's home, the guest assumes that neither the guest nor his or her possessions on the premises will be disturbed by anyone except the host or those allowed by the host to be inside the dwelling. *Id*. See, also, *Jones v. United States*, 362 U.S. 257, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960). A person who has a key to an apartment, is free to come and go, stores belongings there, and pays a part of the rent also has "a sufficient connection to the invaded place to assert the protection of the fourth amendment." *U.S. v. Davis*, 932 F.2d 752, 757 (9th Cir. 1991).

In *State v. Gonzalez*, 211 Neb. 697, 320 N.W.2d 107 (1982), *cert. denied* 459 U.S. 1039, 103 S. Ct. 454, 74 L. Ed. 2d 607, we held that Gonzalez lacked standing to challenge the search of a duplex from which he had recently departed, because "[t]here was no showing whether the defendant was, in fact, ever residing at the [duplex], rented or owned the property, exercised any type of control over the property, or kept any clothing or

personal belongings at the property." 211 Neb. at 703, 320 N.W.2d at 111. We also stated that "the capacity to claim protection of the fourth amendment as to unreasonable searches and seizures depends not upon the property right in the invaded place but upon whether the person who claims the protection of the fourth amendment has a legitimate expectation of privacy in the invaded place." *Id*. Accord *State v. Cortis*, 237 Neb. 97, 465 N.W.2d 132 (1991). Consequently, since constitutional protection against an unreasonable search and seizure is a personal right, a defendant's expectation of privacy in another's residence, not the fact that the building is someone else's residence, gives the defendant a legitimate expectation of privacy and standing to challenge a police search of the residence.

In the present case, Baltimore testified that although he did not reside in Cowans' home, he did maintain a garden at or near that residence. Baltimore also testified that Cowans gave him permission to use the garden hose kept in Cowans' house and to obtain water from that residence. Baltimore "sometimes" had a key for Cowans' house so that he could get the garden hose when Cowans was away. Therefore, although Baltimore did have a key to Cowans' house, he had the key for the very limited purpose of getting Cowans' garden hose from the house. Consequently, Baltimore lacked Cowans' general permission to enter the house for any purpose other than getting the garden hose. Also, Baltimore never exercised general control over Cowans' house or its contents and did not keep his personal belongings in the house. On the night he was arrested, Baltimore had asked for, and received, Cowans' house key and permission to use the toilet in the house. Baltimore's conduct that night negates existence of an unlimited right to enter Cowans' house. Moreover, Baltimore's presence in Cowans' house on the night of the arrest was totally unrelated to getting the garden hose, the only purpose for which Baltimore was given a key to the Cowans house before the night of the arrest. Thus, Baltimore's connection with Cowans' house consisted of intermittent entry for a limited purpose and sporadic presence without an unrestricted right of occupancy on the premises. In the final analysis of Baltimore's association with the Cowans

house, nothing indicates that Baltimore, even with a key to the house, had a legitimate expectancy of freedom from others' entering Cowans' house; hence, he was not constitutionally secure under U.S. Const. amend. IV or Neb. Const. art. I, § 7, from the police coming in or intruding into Cowans' house where the Ritalin and Talwin were discovered by the police. Although Baltimore places much stock in his having a key for access to Cowans' house, more than possession of a house key is necessary for access to the Constitution for an objection against the police search of Cowans' house without a warrant.

Consequently, we conclude that Baltimore's limited access to the Cowans house is insufficient to demonstrate that Baltimore had a legitimate expectation of privacy in Cowans' house. Without that expectation of privacy, Baltimore lacked standing to challenge the police search that disclosed the Ritalin and Talwin in Cowans' residence.

Because Baltimore lacked a legitimate expectation of privacy in Cowans' house and, hence, lacked standing to challenge the warrantless search of that house, we affirm the district court's judgment that the evidence in question was constitutionally admissible in Baltimore's trial.

AFFIRMED.