Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/30/2018 09:12 AM CST

State of Nebraska, appellee, v.
Issa Abu-Serieh, appellant.
___ N.W.2d ___

Filed January 16, 2018.    No. A-17-151.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment or the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. But whether those facts trigger or violate Fourth Amendment or Fifth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Standing: Warrantless Searches.** Before a party may challenge a search without a warrant, he or she must have standing in a legal controversy.

3. **Standing: Words and Phrases.** "Standing" means that a person has a sufficient legally protectable interest which may be affected in a justiciable controversy, entitling that person to judicial resolution of the controversy.

4. **Constitutional Law: Search and Seizure: Standing.** A "standing" analysis in the context of search and seizure is nothing more than an inquiry into whether the disputed search and seizure has infringed an interest of the defendant in violation of the protection afforded by the Fourth Amendment.

5. **Standing: Courts: Jurisdiction: Parties.** Because the requirement of standing is fundamental to a court's exercise of jurisdiction, a litigant or a court before which a case is pending may raise the question of standing at any time during the proceeding.

6. **Constitutional Law: Search and Seizure.** Ordinarily, two inquiries are required to determine whether an individual may make a challenge

under the Fourth Amendment. First, an individual must have exhibited an actual (subjective) expectation of privacy, and second, the expectation must be one that society is prepared to recognize as reasonable.

7. **Standing: Motor Vehicles: Search and Seizure: Contracts.** The driver of a rental vehicle may have standing to challenge the search or seizure of such vehicle if he or she can demonstrate that he or she received permission to drive the vehicle from the individual authorized on the rental agreement.

8. **Standing: Warrantless Searches.** Mere possession of a key granting access to a house does not necessarily create standing to raise an objection to a warrantless search.

9. **Investigative Stops: Motor Vehicles: Probable Cause.** A traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle.

10. **Investigative Stops: Police Officers and Sheriffs: Probable Cause.** If an officer has probable cause to stop a violator, the stop is objectively reasonable and any ulterior motivation is irrelevant.

11. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop.

12. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.** A law enforcement officer may conduct certain unrelated checks during an otherwise lawful traffic stop, so long as doing so does not measurably extend the duration of the stop.

13. **Investigative Stops: Motor Vehicles: Police Officers and Sheriffs: Probable Cause.** In order to expand the scope of a traffic stop and continue to detain the motorist, a law enforcement officer must have a reasonable, articulable suspicion that a person in the vehicle is involved in criminal activity beyond that which justified the initial stop.

14. **Probable Cause: Words and Phrases.** Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause.

15. **Miranda Rights: Self-Incrimination.** *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements stemming from the custodial interrogation of a defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.

16. **Miranda Rights.** The *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.

17. **Miranda Rights: Investigative Stops: Motor Vehicles.** Persons temporarily detained pursuant to an investigatory traffic stop are not in custody for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

18. **Miranda Rights: Investigative Stops: Motor Vehicles: Police Officers and Sheriffs.** Neither detention pursuant to a traffic stop nor continued voluntary contact with law enforcement constitutes a formal arrest or restraint on an individual's freedom sufficient to require *Miranda* warnings.

Appeal from the District Court for Lancaster County: Andrew R. Jacobsen, Judge. Affirmed.

Steven B. Muslin, of Muslin & Sandberg, and Thomas J. Olsen, of Olsen Law Offices, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Pirtle, Riedmann, and Arterburn, Judges.

Riedmann, Judge.

## INTRODUCTION

Following a stipulated bench trial, Issa Abu-Serieh was found guilty of one count of delivery or possession with intent to deliver a controlled substance, marijuana. The district court for Lancaster County sentenced him to 18 to 36 months' imprisonment. Abu-Serieh now appeals his conviction. Following our review of the record, we affirm.

## BACKGROUND

The events giving rise to this case, and the issues raised on appeal, are substantially intermingled with those in a companion case filed today in *State v. Khalil, ante* p. 449, ___ N.W.2d ___ (2018).

On January 25, 2015, Lancaster County Deputy Sheriff Jason Henkel observed two vehicles traveling eastbound on Interstate 80. The first was a Nissan Altima; immediately behind the Nissan was a Ford Edge. Henkel observed that both

vehicles had out-of-state license plates and that both appeared to be following the vehicle in front of them too closely. Henkel believed that the two vehicles were traveling together based on "their driving habits" and the fact that they appeared to be staying close to one another. Henkel used a stopwatch to time both vehicles' speed and distance traveled and determined that both vehicles were following at a closer distance than is considered safe. Henkel contacted Deputy Sheriff Jason Mayo and requested that he initiate a traffic stop of the Ford for following too closely while Henkel initiated a traffic stop of the Nissan.

Mayo initiated a traffic stop of the Ford and made contact with the driver and sole occupant, who was later identified as Abu-Serieh. Abu-Serieh provided Mayo with a copy of the rental agreement for the vehicle, which was not rented in his name. Abu-Serieh stated that he was coming from California and that a cousin had rented the vehicle for him there. When Mayo asked Abu-Serieh if he was traveling with anyone, Abu-Serieh responded that he was not.

Mayo informed Abu-Serieh that he would be issuing a warning citation for following too closely and requested that Abu-Serieh accompany him to his cruiser while he completed the paperwork. Abu-Serieh complied and sat in the front passenger seat of Mayo's cruiser.

During this time, Mayo maintained contact with Henkel via the mobile data terminal in each of their cruisers. The deputies exchanged details regarding the information that Abu-Serieh and the other driver, who was identified as Ali E. Khalil, gave them. Henkel informed Mayo that Khalil had stated that he and Abu-Serieh were traveling together and that he had rented the vehicle Abu-Serieh was driving. Mayo was ultimately able to confirm that the vehicle driven by Abu-Serieh was rented in Khalil's name. Furthermore, Khalil reported that he was coming from a trucking convention in Salt Lake City, Utah, while Abu-Serieh stated that he was coming from California.

After Mayo completed the paperwork and gave the warning citation to Abu-Serieh, he asked Abu-Serieh if he could ask a few additional questions. Abu-Serieh consented. Mayo then asked Abu-Serieh if he had any illegal items in his vehicle such as marijuana. Mayo also informed Abu-Serieh that he had smelled the odor of raw marijuana when he initially made contact at the vehicle's window. Abu-Serieh responded that he did not have marijuana in his vehicle. Mayo then asked Abu-Serieh if he could search the vehicle, and Abu-Serieh consented.

During his search, Mayo found two marijuana joints in a plastic container along with a piece of drug paraphernalia and two driver's licenses for Abu-Serieh. In the back cargo area, Mayo found a spare tire for another vehicle, as well as its component parts, and the contents of another vehicle's trunk.

While Mayo was searching Abu-Serieh's vehicle, Henkel was simultaneously searching Khalil's vehicle. During Mayo's search, Henkel contacted Mayo and asked if he had found a "trunk lock key" for the Nissan. Mayo found a key that appeared to match this description in a backpack on the front passenger seat of the Ford.

Both deputies testified that in order to open the trunk, the trunk lock located inside the glovebox had to be turned off. The key found in Abu-Serieh's backpack turned off the trunk lock which allowed the deputies to open the trunk. After the Nissan's trunk was opened, the deputies found 128 pounds of marijuana inside. Abu-Serieh and Khalil were both subsequently placed under arrest. Mayo testified that he placed both parties in the back seat of his cruiser and read them their *Miranda* warnings. After being booked at the jail, Abu-Serieh admitted to Mayo that he was to receive $6,000 to be another driver for the transportation of the load of marijuana from California to Chicago, Illinois.

Abu-Serieh was charged with delivery or possession with intent to deliver a controlled substance, marijuana, in violation of Neb. Rev. Stat. § 28-416(1) and (2)(b) (Cum. Supp.

2014). He filed a motion to suppress, claiming that his rights under the Fourth and Fifth Amendments had been violated. The district court held a hearing on the motion and overruled it, finding that there was probable cause to stop Abu-Serieh's vehicle, that the statements he made in Mayo's cruiser were not custodial and not subject to *Miranda* warnings, that Abu-Serieh freely and voluntarily consented to the search of his vehicle, and that there was probable cause based on the totality of the circumstances for Abu-Serieh's arrest. The district court additionally found that Abu-Serieh waived his *Miranda* rights and that his postarrest statements were admissible.

The district court subsequently held a stipulated bench trial and found Abu-Serieh guilty. The court sentenced Abu-Serieh to 18 to 36 months' imprisonment. Abu-Serieh now appeals.

## ASSIGNMENT OF ERROR

Abu-Serieh assigns, restated, that the district court erred in denying his motion to suppress.

## STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment or the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), we apply a two-part standard of review. See, *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012); *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011). Regarding historical facts, we review the trial court's findings for clear error. *State v. Bauldwin, supra*; *State v. Nelson, supra*. But whether those facts trigger or violate Fourth Amendment or Fifth Amendment protections is a question of law that we review independently of the trial court's determination. *State v. Bauldwin, supra*; *State v. Nelson, supra*.

## ANALYSIS

Abu-Serieh argues that the district court erred in denying his motion to suppress. Specifically, he claims that the district

court erred in finding that the deputies did not violate his rights under the Fourth and Fifth Amendments.

*Fourth Amendment.*

Abu-Serieh claims that the deputies violated his Fourth Amendment rights by stopping his vehicle on a pretextual basis and improperly extending the scope of the traffic stop. He also argues that he had a legitimate expectation of privacy in the trunk of Khalil's vehicle due to his possession of the key that opened the trunk. He argues that due to this expectation of privacy, the violation of Khalil's Fourth Amendment rights in the search and seizure of Khalil's rental vehicle violated his Fourth Amendment rights as well.

[2-6] Before a party may challenge a search without a warrant, he or she must have standing in a legal controversy. See *State v. Baltimore*, 242 Neb. 562, 495 N.W.2d 921 (1993). "Standing" means that a person has a sufficient legally protectable interest which may be affected in a justiciable controversy, entitling that person to judicial resolution of the controversy. *Id*. A "standing" analysis in the context of search and seizure is nothing more than an inquiry into whether the disputed search and seizure has infringed an interest of the defendant in violation of the protection afforded by the Fourth Amendment. *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011). Because the requirement of standing is fundamental to a court's exercise of jurisdiction, a litigant or a court before which a case is pending can raise the question of standing at any time during the proceeding. *State v. Baltimore, supra*. To determine whether an individual may make a challenge under the Fourth Amendment, we must determine whether an individual has a legitimate or justifiable expectation of privacy. See *State v. Nelson, supra*. Ordinarily, two inquiries are required for such a determination. First, an individual must have exhibited an actual (subjective) expectation of privacy, and second, the expectation must be one that society is prepared to recognize as reasonable. *Id*.

[7] Both the U.S. Supreme Court and the Nebraska Supreme Court have held that individuals have a lesser expectation of privacy in a motor vehicle than in a home or office because a motor vehicle's "function is for transportation purposes and it seldom serves as one's residence or as the repository of personal effects." See *State v. Konfrst*, 251 Neb. 214, 224, 556 N.W.2d 250, 259 (1996), citing *United States v. Chadwick*, 433 U.S. 1, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977). The expectation of privacy in one's vehicle extends to rental vehicles. See *State v. Nelson, supra*. Nebraska law has held that the driver of a rental vehicle may have standing to challenge the search or seizure of such vehicle if he or she can demonstrate that he or she received permission to drive the vehicle from the individual authorized on the rental agreement. See *id*.

Here, Abu-Serieh contends that he had a legitimate expectation of privacy in the trunk of Khalil's vehicle because he was in possession of the key that opened the trunk. However, nowhere in his brief does he explain why he believes possession of the key gives rise to a reasonable, legitimate expectation of privacy. Instead, his argument on this issue consists of only conclusory statements that such a legitimate expectation of privacy exists.

The State argues that Abu-Serieh lacks standing to challenge the search and seizure of Khalil's vehicle. The State claims that there is no evidence that Abu-Serieh ever drove or traveled in Khalil's vehicle, that he had any belongings in Khalil's vehicle, or that he ever had dominion or control over Khalil's vehicle or any of its contents. Although Abu-Serieh was in possession of the key to the vehicle's trunk, the State argues that there is a difference between a party having access to the trunk and a party having a reasonable expectation of privacy in the trunk.

In *State v. Baltimore*, 242 Neb. 562, 495 N.W.2d 921 (1993), the Nebraska Supreme Court considered whether a party had standing to challenge the search of the house where he was arrested when he did not reside in the house. There, Steave

Baltimore had permission and "'sometimes'" had a key to his neighbor's home for the limited purpose of using the neighbor's garden hose. *Id.* at 572, 495 N.W.2d at 928. On the night that Baltimore was arrested, he had asked for and received his neighbor's house key and permission for the purpose of using the neighbor's bathroom. Law enforcement officers made contact with Baltimore at the door to the house and subsequently entered the home and found prescription drugs.

[8] On appeal, Baltimore argued that the search of the house was unlawful. The Supreme Court found that Baltimore had a key to his neighbor's house for a very limited purpose, never exercised control over the house or its contents, did not keep his personal belongings there, and did not have an unlimited right to enter the house. *State v. Baltimore, supra*. The court held that "[a]lthough Baltimore places much stock in his having a key for access to [his neighbor's] house, more than possession of a house key is necessary for access to the Constitution for an objection against the police search of [his neighbor's] house without a warrant." *Id*. at 573, 495 N.W.2d at 928. Finding that Baltimore's limited access to his neighbor's house was insufficient to demonstrate a legitimate expectation of privacy in the home, the Supreme Court held that Baltimore lacked standing to challenge the search. Thus, mere possession of a key granting access to a house does not necessarily create standing to raise an objection to a warrantless search. See *State v. Baltimore, supra*.

While we find no Nebraska case law directly on point for the issue of whether possession of a key to the trunk of a vehicle rented in another individual's name is sufficient to give rise to a legitimate expectation of privacy, we believe that the factors outlined in *State v. Baltimore, supra*, can be applied in this case.

Here, Abu-Serieh claims to have a legitimate expectation of privacy in the trunk of Khalil's vehicle due to his possession of the key that opened the trunk. However, there is no evidence in the record to indicate that Abu-Serieh ever exercised any

type of control over the trunk or any other part of Khalil's vehicle. The law enforcement officers found no evidence that Abu-Serieh kept any personal belongings anywhere in Khalil's vehicle. Furthermore, the vehicle was rented in Khalil's name, not Abu-Serieh's.

While Abu-Serieh did possess the key that opened the locked glovebox, thereby giving access to the trunk lock, that was the key's only purpose; it was not a key to the vehicle itself. Additionally, Henkel and Mayo testified that in order to use the key to open the trunk, it must be inserted into a lock in the glovebox that would then allow the trunk lock to be turned either on or off. Based on this testimony, it appears that a person must first have access to the passenger compartment of the vehicle in order to use the trunk key. This indicates that Abu-Serieh did not have an unlimited right to access the trunk, as use of the key required Khalil to grant him access to the vehicle's passenger compartment.

Based on these factors, as well as the lesser expectation of privacy an individual has in a vehicle, we find that Abu-Serieh did not have a legitimate expectation of privacy in the trunk of Khalil's rental vehicle and therefore does not have standing to challenge the search and seizure of the vehicle. Other jurisdictions addressing the issue of whether possession of a key creates a reasonable expectation of privacy in the item which the key unlocks have similarly found a lack of standing. See, e.g., *U.S. v. Stokes*, 829 F.3d 47 (1st Cir. 2016) (no standing to maintain Fourth Amendment challenge to search of post office box to which defendant held key); *U.S. v. Reyes*, 908 F.2d 281 (8th Cir. 1990) (possession of key to rental locker does not create reasonable expectation of privacy in locker); *United States v. Sanchez*, 635 F.2d 47 (2d Cir. 1980) (possession of keys insufficient to give defendant constitutionally protected interest in privacy of car).

Because Abu-Serieh lacks standing to challenge the search of the Nissan, our analysis will focus solely on the stop of the Ford driven by Abu-Serieh.

Abu-Serieh argues that Mayo improperly expanded the scope of the traffic stop by asking him questions unrelated to the offense of following too closely and by extending the scope past the time at which Mayo issued him a warning citation. We disagree.

[9,10] Before addressing the merits of his argument, we note that Abu-Serieh spends a significant portion of his brief arguing that the stop of his vehicle was pretextual. However, he also concedes that "[t]he evidence is unrebutted that the traffic stop was properly initiated . . . ," brief for appellant at 27, and that Henkel had "both reasonable suspicion . . . and probable cause" to stop Abu-Serieh's vehicle for the offense of following too close, *id.* at 31. It is well established that a traffic violation, no matter how minor, creates probable cause to stop the driver of a vehicle. *State v. Jasa*, 297 Neb. 822, 901 N.W.2d 315 (2017). If an officer has probable cause to stop a violator, the stop is objectively reasonable and any ulterior motivation is irrelevant. *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008). It is clear from the record that the stop of Abu-Serieh's vehicle was lawful.

[11,12] Once a vehicle is lawfully stopped, a law enforcement officer may conduct an investigation reasonably related in scope to the circumstances that justified the traffic stop. *State v. Nelson*, 282 Neb. 767, 807 N.W.2d 769 (2011). This investigation may include asking the driver for an operator's license and registration, requesting that the driver sit in the patrol car, and asking the driver about the purpose and destination of his or her travel. *Id*. Also, the officer may run a computer check to determine whether the vehicle involved in the stop has been stolen and whether there are any outstanding warrants for any of its occupants. *Id*. The U.S. Supreme Court has held that an officer may conduct certain unrelated checks during an otherwise lawful traffic stop, so long as doing so does not measurably extend the duration of the stop. *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009).

[13,14] In order to expand the scope of a traffic stop and continue to detain the motorist, an officer must have a reasonable, articulable suspicion that a person in the vehicle is involved in criminal activity beyond that which initially justified the stop. See *State v. Nelson, supra*. Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. *Id*.

Here, Mayo testified that during the course of the traffic stop, he asked Abu-Serieh where he was from, what he did for a living, as well as his general itinerary and travel plans. Abu-Serieh stated that he was coming from California, where his cousin had rented the vehicle for him, and that he was not traveling with anyone else. After completing the paperwork for the warning citation and handing it to Abu-Serieh, Mayo sought permission to ask a few additional questions and Abu-Serieh consented. At that point, Mayo asked Abu-Serieh if he had any illegal items such as marijuana in his vehicle and informed Abu-Serieh that he had smelled the odor of raw marijuana upon making initial contact at the vehicle's window. Abu-Serieh denied having marijuana in the vehicle and consented to Mayo's request to search the vehicle.

Although Mayo conceded that some of the questions he asked Abu-Serieh during the traffic stop were unrelated to issuing a warning citation, there is nothing in the record to suggest that such questions extended the duration of the stop. Furthermore, after Mayo completed the warning citation and handed it to Abu-Serieh, thereby completing the traffic stop, Abu-Serieh consented to additional questioning. At that time, we find that Abu-Serieh was no longer detained and was instead engaged in a voluntary contact with Mayo. Such voluntary contact does not require reasonable suspicion because Abu-Serieh was no longer detained and was free to terminate the encounter. Abu-Serieh also consented to a search of his vehicle thereby agreeing to an extension of the scope of

the stop. Accordingly, we find no merit to this assignment of error.

*Fifth Amendment.*

Abu-Serieh argues that Mayo's question to him of whether he had any drugs "created a hazard of incrimination" and that he was compelled to answer the question or be penalized for asserting his right to refuse to answer. Brief for appellant at 39. He therefore concludes that Mayo was required to read him his *Miranda* rights prior to posing the question. This argument fails for two reasons. First, Abu-Serieh was not in custody. Second, Mayo posed the question only after Abu-Serieh consented to additional questioning.

[15-17] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements stemming from the custodial interrogation of a defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *State v. Cody*, 248 Neb. 683, 539 N.W.2d 18 (1995). The *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *State v. DeJong*, 287 Neb. 864, 845 N.W.2d 858 (2014). A person is in custody for purposes of *Miranda* when there is a formal arrest or a restraint on his or her freedom of movement to the degree associated with such an arrest. See *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011). Persons temporarily detained pursuant to an investigatory traffic stop are not in custody for purposes of *Miranda*. *State v. Landis, supra*.

Because Abu-Serieh was only temporarily detained pursuant to an investigatory traffic stop when he was seated in the cruiser, he was not in custody for purposes of *Miranda*. Furthermore, Abu-Serieh consented to additional questioning. See *State v. Landis, supra* (determining defendant voluntarily stayed in cruiser for additional questioning at officer's request and therefore was not in custody).

[18] Neither detention pursuant to a traffic stop nor continued voluntary contact with law enforcement constitutes a formal arrest or restraint on an individual's freedom sufficient to require *Miranda* warnings. Therefore, we find no merit to this assignment of error.

## CONCLUSION

Following our review of the record, we find Abu-Serieh's assignment of error to be without merit and therefore affirm.

Affirmed.